H. DUYS & COMPANY, INCORPORATED, ET ALS.
v. JOSEPH M. TONE.

MALTBIE, C. J., HINMAN, AVERY, BROWN and JENNINGS, JS.

Argued February 9—decided March 8, 1939.

*Harry Silverstone,* special assistant attorney general, with whom, on the brief, was *Francis A. Pallotti,* attorney general, for the appellant (defendant).

*Harry L. Nair,* with whom, on the brief, was *Solomon Elsner,* for the appellee (named plaintiff).

*Howard W. Alcorn,* with whom, on the brief, was *Hugh M. Alcorn,* for the appellees (co-plaintiffs).

HINMAN, J. The named plaintiff is a corporation engaged in the business of dealing in leaf tobacco and among its other activities has conducted a tobacco warehouse in Hartford since 1933. The defendant, the state commissioner of labor and factory inspection, acting as administrator of the state Unemployment Compensation Act, General Statutes, 1937 Supplement, Chapter 280a, under authority of § 814d thereof, made an assessment against Duys & Company, Inc., hereinafter referred to as the corporation, based upon wages paid by it to persons employed at its Hartford warehouse in processing and handling shade tobacco grown by and upon the land of the other (intervening) plaintiffs. The corporation appealed to the Superior Court from this assessment, claiming that the wages were of employees engaged in "agricultural labor" and as such exempt under the act. The plaintiffs other than the corporation are individual tobacco farmers, with farms in the Connecticut Valley, and are growers of shade tobacco, which is grown under cloth, is a higher grade of leaf than other types of tobacco and is used entirely for cigar wrappers. After shade tobacco is grown, picked, and cured while hanging in the shed, it is taken down and packed into cases for removal to a warehouse for further processing. At this stage it is unfit for use by cigar manufacturers and is not a salable product but must go through the processes of bulk sweating, assorting, sizing and baling in order to make it fit for marketing. After baling, it is again placed in storage for further curing, after which it is sampled

by inspectors of the United States department of agriculture and is then ready to be offered for sale. The processing and packing in the warehouse is entirely hand labor.

From 1930 to 1933 crops of shade tobacco grown by the plaintiff growers were processed and packed at a Hartford warehouse which in 1933 was taken over by the corporation and the 1935 and 1936 crops of the plaintiff growers were processed and packed by it at that warehouse. These operations were performed pursuant to separate contracts entered into by each of the growers and the corporation which constituted the latter the agent of the grower to process, pack and market the crop which the grower was to raise, it to receive a specified commission for selling the tobacco and guaranteeing the accounts and to buy, at an appraised price, whatever tobacco remained unsold at the end of two years. Upon the sale of the grower's tobacco the corporation was to deduct from the price received its commission and the cost of insuring, warehousing, processing, sampling, storing and shipping it, including taxes and brokers' commissions, if any, and to pay over the balance to the grower. No crops of tobacco other than those of the plaintiff growers were delivered to or handled at this warehouse. The sales of the tobacco were made in the name of the corporation but title to each grower's crop remained in him until sold. The tobacco known as Connecticut Valley shade-grown is grown only in Massachusetts and Connecticut. About two-thirds of the total production in 1935 and 1936 was processed and packed by the owners and tenants of the land on which it was grown; five corporations, growing approximately half of the total acreage of Connecticut Valley shade, so processed and packed the tobacco grown by them.

The Superior Court, from the facts found by it, in-

cluding the foregoing, concluded that the employees on whose wages the assessment was made were not the employees of the growers but of the corporation, but that "the regulations adopted by the administrator in respect to agricultural labor, in so far as they provide that in order to procure exemption from the tax the employees doing the processing and packing must be the employees of the owner or tenant of the land upon which the crops have been raised, are not consonant with the Act itself," and held that the wages in question were from "agricultural labor" within the meaning of the act. The controlling issue on this appeal relates to the conclusion above quoted—in effect that the provision in the regulations that in order to procure exemption from the tax, the employees doing the processing and packing must be employees of the owner or tenant of the farm on which the materials in their raw or natural state were produced, rendering exemption dependent upon performance by employees of the grower himself, as distinguished from employees of those engaged distinctively in the processing and packing alone, is invalid because beyond the purview of the statute. The Connecticut act was adopted in consequence of the enactment of the federal social security acts. 42 U. S. C. A., § 901 et seq., § 1101 et seq., 49 U. S. Stat. at Large, pp. 626, 635. Many other states have adopted similar acts and under them regulations similar to that here involved have been promulgated.

The federal act, § 907(c), defines "employment" as meaning "any service, of whatever nature, performed . . . by an employee for his employer, except—(1) Agricultural labor; . . ." and § 908 provides that the commissioner of internal revenue, with the approval of the secretary of the treasury, "shall make and publish rules and regulations for the enforcement of this

title." Pursuant thereto regulations were made (approved February 17, 1936), including one, Art. 206(1), which is printed as a footnote.[1] This was followed verbatim by the Connecticut administrator in adopting, under authority of § 811d(a), the regulation (3) here under consideration. While the pertinent section of the federal act (907[c]) and the corresponding provision of our act (§ 803d[a]) differ somewhat in phraseology, we find nothing in those differences which would affect the admissibility and construction of the respective identical regulations. Such light as may be obtained as to the reason and purpose of the federal act and regulation therefore is of significance as to the attributes of this state regulation. The reason assigned in the reports of the congressional committees was "difficulties in collecting the tax." House Report No. 615, p. 33, Senate Report No. 628, p. 45, 74th Congress, 1st Session. Intimation to the same effect is afforded in *Carmichael* v. *Southern Coal & Coke Co.*, 301 U. S. 495, 57 Sup. Ct. 868, concerning the Alabama Unemployment Compensation Act, wherein it is said (p.

[1] Agricultural labor.—The term "agricultural labor" includes all services performed—

(a) By an employee, on a farm, in connection with the cultivation of the soil, the harvesting of crops, or the raising, feeding, or management of live stock, bees, and poultry; or

(b) By an employee in connection with the processing of articles from materials which were produced on a farm; also the packing, packaging, transportation, or marketing of those materials or articles. Such services do not constitute "agricultural labor," however, unless they are performed by an employee of the owner or tenant of the farm on which the materials in their raw or natural state were produced, and unless such processing, packing, packaging, transportation, or marketing is carried on as an incident to ordinary farming operations as distinguished from manufacturing or commercial operations.

As used herein the term "farm" embraces the farm in the ordinary accepted sense, and includes stock, dairy, poultry, fruit, and truck farms, plantations, ranches, ranges, and orchards.

Forestry and lumbering are not included within the exception.

513): "Administrative considerations may explain several exemptions. Relatively great expense and inconvenience of collection may justify the exemption from taxation of domestic employers [also exempted in the same section of the federal and state acts], farmers, and family businesses, not likely to maintain adequate employment records, which are an important aid in the collection and verification of the tax. . . ." It seems reasonable and probable that the practical reason so indicated—avoidance of administrative difficulties in ascertaining and collecting the tax, involving expense disproportionate to the resulting advantages—was the one motivating the exemption here involved rather than a paramount purpose to benefit and encourage agriculture.

As to the logical and legal distinction between agricultural and industrial employees, *Davis & Co.* v. *Mayor and Council of Macon,* 64 Ga. 128, is relevant. In that case, in sustaining an ordinance taxing the sale of meat and milk but exempting farmers selling their own products, it is said (pp. 131, 132): "The business of a farmer is production, not trade, and the sale directly by himself of what he rears or produces is merely occasional or incidental. . . . The producer whose trade is incident to production, and the middleman whose trade is intermediary between the producer and the consumer, belong not to the same class, but to different classes of subjects in a scheme of taxation. At least, the difference is wide enough to justify, if not to compel, its recognition in shaping the scheme." The corporation's situation is analogous to that of the middleman in that case and we discern no difference in principle between sales by the latter and operations such as are here involved. *American Sugar Refining Co.* v. *Louisiana,* 179 U. S. 89, 21 Sup. Ct. 43, sustained the constitutionality of a state statute im-

posing a license tax on the business of refining sugar and molasses but exempting planters and farmers doing their own grinding and refining, saying (p. 95): "The constitution of Louisiana classifies refiners of sugar for the purpose of taxation into those who refine the products of their own plantations, and those who engage in a general refining business, and refine sugars purchased by themselves or put in their hands by others for that purpose, imposing a tax only upon the latter class. To entitle a party to exemption it must appear (1) that he is a farmer or planter; (2) that he grinds the cane as well as refines the sugar and molasses; (3) that he refines his own sugar and molasses, meaning thereby the product of his own plantation. . . . The discrimination . . . does not deny to persons and corporations engaged in a general refining business the equal protection of the laws." See also *Hicklin* v. *Coney*, 290 U. S. 169, 176, 54 Sup. Ct. 142. In *Smith* v. *Cahoon*, 283 U. S. 553, 567, 51 Sup. Ct. 582, and *Priest* v. *State Tax Commission*, 258 Ky. 391, 394, 80 S. W. (2d) 43, the same principle was recognized, but the discrimination involved, being in favor of transportation of agricultural products as distinguished from other commodities, instead of in favor of the agricultural producer, was held invalid.

The Connecticut act was adopted following report, in November, 1936, of a special commission appointed by the Governor, which gave the subject exhaustive study and investigation, and was based upon a draft of a bill submitted by that commission, and the exceptions, including "agricultural labor," in § 803d(a) conformed to the recommendation of the commission which stated (Report of Governor's Commission on Unemployment, p. 11) that these "parallel the exemptions from tax in Section 907(c)" of the federal act. These considerations are available in construing the

act. *Connecticut Rural Roads Improvement Asso.* v. *Hurley,* 124 Conn. 20, 26, 197 Atl. 90. In so utilizing them we are justified in assuming that the commission was cognizant and took account of not only the provision of the federal act which was "paralleled" but also the federal regulation defining the term "agricultural labor" which had been promulgated the preceding February, and that it, and the Legislature in adopting the provision, contemplated and intended a like meaning as attaching thereto.

There is, as yet, a scarcity of helpful judicial decisions pertaining to the pertinent provision of the federal and state acts and regulations promulgated under them. In *Great Western Mushroom Co.* v. *Industrial Commission* (Colorado, 1938) 82 Pac. (2d) 751, provision in the regulation that services do not constitute agricultural labor "unless the processing, packing, packaging, transportation, or marketing is carried on as an incident to ordinary farming operations" was held (p. 752) to be "in keeping with the clear intent of the enactment. . . . The farmer's crops are seasonal, he employs few laborers, and usually for relatively short periods. It is such labor, as we perceive, that the legislature intended to exclude from the operations of the law." In *Pinnacle Packing Co.* v. *State Unemployment Commission of Oregon* (1937) in the Circuit Court for Jackson County, it appeared that the named plaintiff contracts with fruit growers to process, pack, cool, cold storage and market their fruit. After the fruit is delivered to the plaintiff the grower has no further control over the processing or marketing, but when the fruit is sold the plaintiff deducts its costs and expenses and pays the overplus to the grower. The plaintiff claimed exemption as "agricultural labor" but the court held that it was, instead, engaged in an industry and therefore not

exempt. *Allen* v. *Shelton* (C. C. A.) (1938) 96 Fed. (2d) 102, involved a claim that employment in obtaining crude gum by scarification of pine trees and processing the same for the production of turpentine was excepted as agricultural labor from the provisions of the federal act, by § 907c(1), and *Texas Unemployment Compensation Commission* v. *Campbell, Wise & Wright* (1938) 119 S. W. (2d) 388, concerned a claimed exemption of employees of the defendant in the business of picking, packing and shipping vegetables and fruits, but both cases were disposed of on procedural grounds without decision on the merits. In *State ex rel. Industrial Accident Board* v. *Commissioners of Drainage District No. 2* (1938), the Idaho District Court for the third district ruled that the service of the defendants in operating a district drainage system, although an aid to agriculture upon the farms therein, is not agricultural labor within the purview of the state unemployment law.

Lacking further direct precedents both parties seek to invoke by analogy decisions under workmen's compensation acts of other states which, unlike ours, exempt farm or agricultural laborers. 28 R. C. L. 718; 2 Am. Jur. 398; 35 A. L. R. 208. The cases calling for decision as to whether certain employees are within such exceptions are extremely numerous. See Notes, 107 A. L. R. 977, 35 A. L. R. 208, 13 A. L. R. 955, 7 A. L. R. 1296; 1 Schneider, Workmen's Compensation Law (2d Ed.) §§ 31, 32. We have examined many of them, but without obtaining material assistance in solving the present problem. Because of the varying phraseology of the several statutes, the many different kinds of work involved, and conflict in the decisions upon states of fact apparently similar or analogous, it has not been possible to evolve any general rule, even as applicable in workmen's compensation cases.

"The most that can be said is that an employee doing work for a farmer which is ordinarily incidental to farming as that occupation is generally understood is within the purview of the exclusion of farm laborers, unless, at the time of the injury, he was employed by a commercial concern under a contract to perform work for the farmer." Note, 35 A. L. R. 208. There are cases which have held to be within the exception employees of independent contractors engaged in operating for a farmer, on his farm, instrumentalities such as threshing, corn husking and wood sawing machines, ensilage cutter and the like, but it is noticeable that in all of the cases in which services rendered by employees of others than the farmer for whom they were performed have been held to be farm or agricultural laborers, those services have been rendered on the farm or in intimate connection with it. There is a significant dearth of cases of claims for exclusion, as agricultural labor, of work done by employees of such enterprises as creameries and cheese and canning factories, or even cider and grist mills and similar establishments which process farm products for pay in cash or toll and return the product to the grower of the raw material. This strongly suggests recognition of a distinction such as that noted in *Keeney* v. *Beasman,* 169 Md. 582, 588, 182 Atl. 566, "between the production and sale of milk yielded by cattle maintained on the farm as a part of its operation, and the business of buying and selling milk, or of manufacturing and selling milk products apart from, and independent of, any farm, for obviously in the latter case, the work, not having any connection with a farm, would not be agricultural in its nature." In *State* v. *Kennerly,* 98 N. C. 657, 4 S. E. 47, it was ruled that while liquors made by a farmer from grain produced by him by cultivation were exempt, as "products of

his own farm," from a license tax, that made from tolls received from a mill on the farm were not. The material differences in nature, reason and purpose, as well as in statutory details, between workmen's compensation and unemployment compensation laws of necessity detract from such assistance as might be afforded by decisions under the former, and we are unable to derive from them any pervading persuasive principle applicable to the latter. The like is true of cases pertaining to bankruptcy laws.

A farm laborer, as ordinarily understood, is one who labors upon a farm in raising crops or in doing general farm work. *Lowe* v. *Abrahamson,* 18 N. D. 182, 184, 119 N. W. 241; 2 Am. Jur. 396. Agriculture, broadly defined, includes not only cultivation of the soil and its fruits, especially if in an area of such size and character as to be regarded as a farm, but also such processes or steps as are necessary and incident to the completion of the products therefrom for consumption or market. 2 Am. Jur. 395; 3 C. J. S. 366; *Chudnov* v. *Board of Appeals,* 113 Conn. 49, 54, 154 Atl. 161. However, many activities connected with the preparation of farm products for use or sale which formerly were carried on upon the farm or in intimate connection with it, such as the making of butter, cheese and cider have gradually become specialized and removed from the farm, and when this is done such work may properly be regarded as thereby becoming industrial in nature rather than agricultural in the common conception of that term. *Keeney* v. *Beasman,* supra; 1 New International Encyclopedia, 250.

In the case of a statute of wide application, as is an unemployment compensation act, in its adoption, interpretation, and administration, as well as in determining its validity, it is the general field of its operation and effect which is to be regarded rather

than its application to individual exceptional cases, and appropriateness to the general situation is the predominant consideration. *Jeffrey Mfg. Co.* v. *Blagg*, 235 U. S. 571, 577, 35 Sup Ct. 167. In the present instance it cannot be justly said that the dividing line drawn by the regulation determinative of whether or not specified services constitute agricultural labor is illogical in conception or arbitrary or unjust in its general application; that it may be claimed to be not entirely appropriate to an isolated and in some respects unique situation such as that presented here is no adequate ground for condemning a rule which in its general practical operation is not shown to be unreasonable or unjust. The conclusion that the regulation is invalid as not within the purview of the act itself was erroneous.

The plaintiffs assert that, if the regulation be found valid, we should re-examine the trial court's conclusion that the persons doing the work were employees of the corporation and not of the growers; but we are unable to do so for the compelling reason that this conclusion is not assigned as error.

What has already been said, together with the cases cited, supra, is sufficient to refute the claim of the plaintiffs that the regulation denies them the equal protection of the laws and due process of law. *Carmichael* v. *Southern Coal & Coke Co.*, supra; *American Sugar Refining Co.* v. *Louisiana*, supra; *Howes Brothers Co.* v. *Massachusetts Unemployment Compensation Commission* (Mass.) 6 N. E. (2d) 720, 727. A further claim is that the making of the regulation involves an invalid delegation of legislative authority to an administrative officer. The Legislature having by its enactments declared policies and fixed primary standards, may validly confer on administrative officers power to "fill up the details" by prescribing rules

and regulations to promote the spirit and purpose of the legislation and its complete operation. *United States* v. *Shreveport Grain & Elevator Co.,* 287 U. S. 77, 85, 53 Sup. Ct. 42; *United States* v. *Grimaud,* 220 U. S. 506, 31 Sup. Ct. 480; note, 79 L. Ed. 489; *State ex rel. Young* v. *Duval County,* 76 Fla. 180, 79 So. 692; 11 Am. Jur. 926, 956. The instant regulation does not subvert the statute; it does not decide what is and what is not to be deemed an infringement of a law (*State* v. *Kievman,* 116 Conn. 458, 470, 165 Atl. 601); it is within the permissible delegatory powers of the Legislature.

There is error and the case is remanded to the Superior Court with direction to enter judgment dismissing the appeal.

In this opinion the other judges concurred.