**NORTH WHITTIER HEIGHTS CITRUS ASS'N v. NATIONAL LABOR RELATIONS BOARD.**

No. 8819.

Circuit Court of Appeals, Ninth Circuit.

Jan. 12, 1940.

Rehearing Denied Feb. 7, 1940.

Ivan G. McDaniel, of Los Angeles, Cal., for petitioner.

Charles Fahy, Gen. Counsel, Robert B. Watts, Associate Gen. Counsel, and Ruth Weyand, Mortimer B. Wolf, Samuel Edes, and Owsley Vose, Attys., National Labor Relations Board, all of Washington, D. C., for respondent.

Before WILBUR, MATHEWS, and STEPHENS, Circuit Judges.

STEPHENS, Circuit Judge.

Charges by the Citrus Packing House Workers Union Local No. 21,091, were laid before the National Labor Relations Board, that North Whittier Heights Citrus Association was guilty of unfair practices by interfering with, restraining and coercing twenty-eight employees in the exercise of the rights guaranteed under Section 7 of the National Labor Relations Act [49 Stat. 449, 29 U.S.C.A. § 151 et seq.], sometimes herein referred to as the "Act", and sometimes herein referred to as the "Wagner Act", by discouraging membership in a union and by discriminating in regard to hire and tenure of employment of such employees in closing its plant August 14, 1937 and not recalling these employees to work when the plant reopened August 24, 1937. Thereafter the Board issued its complaint in regard thereto, the Association filed its answer, and a hearing was had. At the opening of the hearing the Association filed its motion to dismiss the proceedings upon the ground that its employees were agricultural laborers and therefore exempt from the Board's jurisdiction, and that its operations do not directly burden or affect interstate or foreign commerce. The hearing proceeded and the Board made and filed findings and conclusions and its order to cease and desist certain unfair labor

practices and to reinstate twenty-seven of such employees, and ordered certain additional affirmative action. The complaint was dismissed in so far as it contained allegations of unfair labor practices with respect to O. W. Rudick, one of the twenty-eight employees mentioned in the complaint. The Association petitioned this court to review the proceedings and to set aside the order, to which the Board filed its answer and affirmatively requested enforcement of the order. Hereinafter the Association will be designated as the "Petitioner", and the National Labor Relations Board as the "Board".

There is competent and substantial evidence to support the following factual account of the proceeding. Petitioner is a corporate body organized and existing under the California Agricultural Products Marketing Act [Act No. 146, General Laws of California] with a membership of about 200 citrus fruit growers. It is engaged in the business of receiving, handling, washing, grading, assembling, packing and shipping the citrus fruit of its members and others for marketing under a marketing contract with the Semi-Tropic Fruit Exchange, which has a marketing agreement with the California Fruit Growers Exchange. Through these agencies practically all of the fruit handled by Petitioner moves directly from its plant to vehicles for transportation under the direction of the California Fruit Growers Exchange into interstate and foreign commerce.

Employees of Petitioner are generally persons residing at no great distance from the packing house and most of them have worked in the packing house for many years. The work is seasonal and dependent upon fruit condition in orchard, and consistent with such influences it has been the practice of Petitioner to give notice of suspension of operations and notice when about to reopen.

During the latter part of July, 1937, some agitation for wage increase was going around among the employees and there was some wage increase granted, but there was no general increase. The union heretofore mentioned was formed during this same month and the activity of employees toward that end was met with disapproval by the plant manager. Early in the succeeding month the manager issued a written notice to the employees that they need not join a union under coercion and that they were not under the terms of the Wag-

ner Act. One of the employees was warned in his home by his superintendent to quit talking union in the packing house and quit going to union meetings. On the night of August 10th, 1937, a stranger was excluded from a union meeting and he immediately joined the manager who had been waiting outside in his automobile. On July 30th the manager shook his finger in employee Joseph Matlock's face and warned him that his wife's activity in securing membership in the union must be stopped or that he would "clean house". There were other acts attributable to the packing house management which tend to the conclusion that it was attempting to prevent the formation of the union.

On August 13th, 1937, Petitioner through its manager issued the following signed notice:

"To All Employees:

"Due to conditions beyond our control, orange packing will be discontinued indefinitely at 12:00 o'clock noon, Sunday, August 14, 1937. The lemon house will also shut down for an indefinite period beginning at the same time. Therefore it will be necessary that all employees in all departments of both the orange and lemon division be laid off until work is resumed, and are notified to return.

"Upon your request, your pay in full may be obtained at the office Monday afternoon."

The plant was closed at noon of the next day, at which time there were 118 employees working in the plant. Work was resumed August 23rd, but not all of the employees were notified to return. No grader had joined the union and no grader among the laid off employees failed to be recalled to work. Twenty packers had joined the union, and while all of the non-union packers had been recalled but three of the union employees were recalled to work. There were twenty lemon packers, of whom six had joined the union. No union employee in the lemon division of the packing house was recalled, while thirteen of the fourteen non-union employees were recalled. No other union employees were recalled to work in the packing house. Thus twenty-seven of the thirty-two union employees were not recalled, while only eight of the eighty-two non-union employees were not recalled, and some of the eight were later recalled to work. At the reopening of the plant seventeen,

and shortly thereafter seventeen more non-union new employees were put to work. No additional union men were put to work.

Mrs. Shermer, head of the orange packing department, testified that there were good workers in the union who were not recalled. Additional detailed facts may be related under the different points raised in the case.

The Board's order was that the petitioner

"1. Cease and desist:

"(a) From interfering with, restraining, or coercing its employees in the exercise of the rights to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, or to engage in concerted activities for the purpose of collective bargaining or other mutual aid and protection, guaranteed in Section 7 of the Act.

"(b) From spying, maintaining surveillance, or employing any other manner of espionage over the meetings or meeting places and activities of the Citrus Packing House Workers Union, Local No. 21091, or any other labor organization of its employees.

"(c) From discouraging membership in Citrus Packing House Workers Union, Local No. 21091, or any other labor organization of its employees, by discharging or refusing to reinstate any of its employees or in any other manner discriminating in regard to their hire or tenure of employment or any term or condition of their employment, or by threats of such discrimination."

Petitioner was also ordered to take affirmative action by reinstatement without prejudice to former seniority rights and privileges of all of the employees named in the complaint except O. W. Rudick, and to make them whole as to loss of wages; to post notices as to the cease and desist order; and to notify the Regional Director as to steps taken in compliance with the order.

Petitioner presents its plea for relief under six designated points, and we shall consider them in the order of their presentation in its brief.

### Are the Packing House Workers Agricultural Laborers?

The production and marketing of citrus fruits in California have undergone changes as have various other activities in their transition from "one man" affairs to "big business". The public regard for the product itself has changed from that of a pretty and tasty tidbit to that of a standard and widely used fruit food. Large acreages, in fact large sections of the State of California, are devoted almost wholly to this horticultural product. In the early day everything connected with the product was done "on the farm". Experience produced better fruit, better fruit created greater demand, greater demand impelled system in handling. Possibly the most marked change in this transition was that of systematic marketing and uniformity in preparation for marketing, and these changes brought about the desirability of separating certain processes from the service of the "farmer" to specialists. The farmer also learned through bitter experience that individual grove product sale to middlemen or through consignment to independent fruit marketers resulted too often in ruin. The vast and comprehensive system which has been hereinbefore briefly alluded to was built up to adequately handle this large industry and to eliminate the practices which were so costly to the growers. Thus the growers themselves have separated from the farm, the work now done in the packing house and with which we are here concerned, and have assigned it to an incorporated organization brought into being by the growers for such particular purpose.

We shall proceed to consider whether or not those employed in petitioner's packing house are "agricultural laborers" and as such exempt under the Act from the Board's jurisdiction.

The pursuit of definitions of "agricultural laborers" through the cases leads to confusion because generally the case definitions have grown out of special statutory phraseology or out of judicial effort to conform to legislative intent. While it is quite impossible to phrase an all inclusive yet accurate definition of the term "agricultural laborer" as it is used in the Wagner Act the intent of Congress is not at all obscure.

The very first statement of the Act is: "Section 1 [§ 151]. The denial by employers of the right of employees to organize and the refusal by employers to accept the procedure of collective bargaining lead to strikes and other forms of industrial strife or unrest, which have the intent or the necessary effect of burdening or obstructing

commerce [interstate and foreign] * * *."

In Section 2, subdivision (3), of the Act it is provided that unless the Act explicitly states otherwise, the term "employee" shall include "any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, * * * but shall not include any individual employed as an agricultural laborer, or in the domestic service of any family or person at his home, or any individual employed by his parent or spouse."

The purpose of the Act is clear and we find the Act specifically excepting three kinds of employees from its provisions. It would seem profitable to consider whether or not there is a "common denominator" in these three exemptions. We think there is. Why is "any individual employed by his parent or spouse" exempted? Because (not excluding other reasons) in this classification there never would be a great number suffering under the difficulty of negotiating with the actual employer and there would be no need for collective bargaining and conditions leading to strikes would not obtain. The same holds good as to "domestic service", and the same holds good as to "agricultural laborer" if the term be not enlarged beyond the usual idea that the term suggests. Enlarge the meaning of any of these terms beyond their common usage and confusion results. When every detail of farming from plowing to delivering the produce to the consumer was done by the farmer and his "hired man", this common denominator was present. But when in the transition of citrus fruit growing from this independent action to the great industry of the present in which the fruit is passed from the individual grower through contract to a corporation for treatment in a packing house owned and run by such corporation, to be delivered by this corporation to an allied corporation for transportation and market, we think the common denominator has ceased to exist. The fact that these corporations are allied through their membership of growers does not, in our opinion, affect the situation under consideration. See Pinnacle Packing Company et al. v. State Unemployment Commission, decided February 19, 1937, by the Circuit Court of Jackson County, Oregon.

Petitioner in his brief points to these important changes and concludes, "It therefore becomes important to devise some test or touchstone to determine whether certain practices are agricultural or industrial". It can hardly be contended that agriculture and industry are opposites generically speaking. Agriculture is a great industry. So, of course, petitioner has used these terms in their more limited meanings, and has perhaps unwittingly discovered his sought after "touchstone".

Industrial activity commonly means the treatment or processing of raw products in factories. When the product of the soil leaves the farmer, as such, and enters a factory for processing and marketing it has entered upon the status of "industry". In this status of this industry there would seem to be as much need for the remedial provisions of the Wagner Act, upon principle, as for any other industrial activity.

Petitioner maintains that the nature of the work is the true test. Perhaps it would more nearly conform to the true test to say that the nature of the work modified by the custom of doing it determines whether the worker is or is not an agricultural laborer.

Petitioner argues that if each member of the non-profit cooperative corporation that runs the packing house were to personally hire and direct those doing his own packing and sorting, the work would be agricultural and his employees would be agricultural laborers; that it follows, therefore, that in the case of the same members acting under a single organization to accomplish the same result there can be no change in the nature of the work nor in the status of the persons doing it. The conclusion does not follow. The factual change in the manner of accomplishing the same work is exactly what does change the status of those doing it. The premise laid down by petitioner in this phase of its argument is not, however, the exact situation facing us. The packing house activity is much more than the mere treatment of the fruit. When it reaches the packing house it is then in the practical control of a great selling organization which accounts to the individual farmer under the terms of the statute law and its own by-laws.

There are many instances related in the authorities showing that work done in one way is agricultural labor and workmen doing the same nature of work but under different circumstances are not agricultural laborers, and vice versa. See Trullinger

v. Fremont County, 223 Iowa 677, 273 N. W. 124. Also see Miller & Lux, Inc. v. Industrial Accident Commission, 179 Cal. 764, 178 P. 960, 7 A.L.R. 1291, in which it is held that a workman employed by the Land Company to repair farming equipment was engaged in farm labor; Mullen v. Little, 186 App.Div. 169, 173 N.Y.S. 578, 580, where a farm laborer storing ice for use on the farm was held to be a farm laborer for the reason that the work was "incidental to farm purposes"; and Maryland Casualty Co. v. Dobbs, Tex.Civ.App., 1934, 70 S.W.2d 751, where one working for a company whose business was the spraying of citrus trees was held not to be a farm laborer. There is confusion in the so-called threshing machine cases, as may be ascertained by reference to the note in 13 A.L.R. 955.

So to be agricultural labor, the work need not be strictly related to the crop, and every work related strictly to the crop is not of necessity agricultural labor and those doing it agricultural laborers. It is said in Re Boyer, 65 Ind.App. 408, 117 N.E. 507, 508: "While the threshing of wheat may be a part of the work necessary to be done on the farm, the farmer himself rarely does it. On the contrary, he has it done by some one who is specially equipped with the machinery to do this kind of work. Wheat threshing is a business or industrial pursuit in and of itself, entirely separate and independent of farming." Here is an admirable example of the nature of the work, modified by the custom of doing it affecting the category into which the work falls—agricultural or industrial. See, H. Duys & Co. v. Joseph M. Tone, Commissioner, 125 Conn. 300, 5 A.2d 23.

The opinion in the case of Pinnacle Packing Co. v. State Unemployment Commission, supra, a case arising under a cooperative arrangement for processing and marketing fruit, contains some apt language. We quote: "The fruit growers who are engaged in the care, cultivation, picking, and delivery of the products of the orchard to be processed, graded, packed and marketed are engaged in agricultural labor

and are exempt from the provisions of the statute. As soon as the fruit is delivered by the growers to the plaintiff for processing, grading, packing, and marketing, then the exemption ceases. The plaintiffs engaged in processing, grading, and packing and marketing the fruits are engaged in industry and are, therefore, subject to the provisions of the act and are not exempt as being engaged in agricultural labor."

We conclude that the workers in petitioner's packing house are not agricultural laborers and are therefore not exempt from the operation of the Act.

### Interstate Commerce.

Petitioner contends in its second point as follows: "Briefly, it is the contention of petitioner that when it handles the fruit by picking, grading and packing the same, the fruit is not yet in the channels of trade and commerce, either intrastate or interstate".[1]

At this late date it hardly seems necessary to devote a great deal of attention to this branch of the case. The facts show that the work done by the packing house is in every sense specialized factory work applied to fruit that has left the orchard. The major part of the fruit is moved directly by the packing house workers, through the agency of two allied corporations, into the rail cars for prompt movement in interstate trade. Most certainly any considerable interference in such work would affect the free flow of interstate commerce. N. L. R. B. v. Jones & Laughlin Steel Corp., 301 U.S. 1, 41, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; National Labor Relations Board v. American Potash & Chemical Corp., 9 Cir., 98 F.2d 488, 495, certiorari denied 306 U.S. 643, 59 S.Ct. 582, 83 L.Ed. 1043; National Labor Relations Board v. Santa Cruz Fruit Packing Co., 9 Cir., 91 F.2d 790, 791, affirmed 303 U.S. 453, 58 S.Ct. 656, 82 L.Ed. 954; National Labor Relations Board v. Carlisle Lumber Co., 9 Cir., 94 F.2d 138, certiorari denied 304 U.S. 575, 58 S.Ct. 1045, 82 L.Ed. 1539; National Labor Relations Board v. Biles-Coleman Lumber Co., 9 Cir., 98 F.2d 18.

---

[1] It should, however, be understood that this proceeding concerns packing house workers and packing house work solely, and that there are here no facts as to picking the fruit nor as to any treatment of the orchard. It appears from the stipulation of facts that petitioner to some extent does handle the picking, spraying, fertilizing, etc., and that some of the workers in the packing house are at times employed by petitioner to do such work. However, the employment for packing house work and for orchard work are separate and apart.

It is also too late to argue that there would still be a free flow of fruit entering interstate commerce fully up to the market demand even if no fruit from this packing house should be shipped, and therefore no prohibited effect upon interstate commerce would result. The law condemns practices which substantially affect the free and normal flow of interstate commerce, under conditions that are not denied as existing here. National Labor Relations Board v. Fainblatt, 306 U.S. 601, 59 S.Ct. 668, 83 L.Ed. 1014; Addyston Pipe & Steel Co. v. United States, 175 U.S. 211, 20 S. Ct. 96, 44 L.Ed. 136; McCall v. People of the State of California, 136 U.S. 104, 10 S.Ct. 881, 34 L.Ed. 391, and authorities last above cited.

Were the parties "employees"?

If they were "employees" were they entitled to reinstatement with back pay?

Petitioner next argues that the notice of the shutdown from the manager to the packing house workers constitutes a discharge and a complete break in the relation of employer and employee. There were in this business seasonal shutdowns and occasional temporary shutdowns. The Board found that the shutdown in question was not in the nature of an unfair labor practice, but was in fact caused by the condition of the fruit on the trees. The notice itself treats the shutdown as due to conditions beyond the control of the employer and states that "Therefore it will be necessary that all employees * * be laid off until work is resumed, and are notified to return." It is argued by petitioner that unless the relationship of employer and employee continued to exist through the period of the lay off, which continued relationship it denies, the Board's order of reinstatement with back pay from date of resumption cannot be sustained.

■ This position is based upon § 10 (c) of the Act, 29 U.S.C.A. § 160(c), which authorizes the Board in proper cases to "take such affirmative action, including reinstatement of *employees* with or without back pay, as will effectuate the policies of the Act [this chapter]" and upon the definition of the term "employee" as found in § 2 (3) of the Act. This definition is as follows: "(3) The term 'employee' shall include any employee * * * and * * any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice * * *." Petition-

er holds that the *work has ceased* as to the laid off workers and, as found by the Board, the cessation of work was not "as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice". That therefore they ceased to be employees when the packing house closed down. The Board meets petitioner upon this issue with two answers. The first is that the workers did not cease to be employees with the layoff for the reason that under a proper construction of the statute their "work has not ceased" with the layoff. It is our opinion that the Board's construction on this phase of the proceeding has support. This shutdown and layoff was no more than a suspension of work. It was not a termination of work. It was in accordance with long established custom. The relation of employer and employee does not always depend upon continuity of actual every day work. In the instant suspension of actual operation the employees of long standing and experience were "laid off until work is resumed" on account of a condition of fruit. The notice itself holds out a "notice to return" when conditions have become right, which came about ten days later. In the circumstances, we see no reason for differing with the Board in its holding that the layoff because of the temporary shutdown did not sever the relation of employer and employee.

■ The evidence clearly shows that when the plant reopened after the fruit was in a condition to be handled, the workers named in the complaint other than O. W. Rudick were not put back to work because of their union activities. These employees were ready, willing and able to resume work with the reopening of the plant. The Board found that O. W. Rudick was not entitled to reinstatement and he has not resisted this conclusion. In these circumstances the Board's order for reinstatement of these workers and for back pay from resumption of plant activity was proper. Michaelson v. United State, 7 Cir., 291 F. 940, 942; Iron Molders' Union v. Allis-Chalmers Co., 7 Cir., 166 F. 45, 52, 20 L. R.A.,N.S., 315; Dail-Overland Co. v. Wyllis-Overland, Inc., D.C., 263 F. 171, 188; Jeffery-DeWitt Insulator Co. v. National Labor Relations Board, 4 Cir., 91 F.2d 134, 136–138, 112 A.L.R. 948; National Labor Relations Board v. Carlisle Lumber Co., supra.

The Board also contends that whether or not the suspension of work for the ten

days terminated the relation of employer and employee between the packing house and those at work when the suspension became effective, the order of reinstatement with pay is supported by the provision of § 8 (3) of the Act, 29 U.S.C.A. § 158 (3), prohibiting "discrimination in regard to hire". As we agree with the Board that the shutdown did not affect the relation of employee and employer as to those working at the time of the shutdown, it is unnecessary for us to consider this additional point.

### Subpœnas.

Petitioner's next point is to the effect that requests to the Board for the issuance of certain subpœnas were met with the reply that: "It is necessary for you to furnish statement of reason for application and of evidence you expect to be established by testimony of individuals together with statement of their positions before the Board can act on your application." Petitioner claims that such requirement encroached upon its rights but that in order to go forward with the proceeding it was compelled to grant this request. Petitioner does not specify any prejudice done it, and a very careful perusal of the evidence does not convince us that it suffered any prejudice by complying with the Board's request. In the circumstances, even if we were to hold that the request was wholly unwarranted in law (upon which subject we express no opinion) we would not be warranted in nullifying the Board's order. As tersely put in the Board's brief, "Due process, however, is not concerned with technicalities, but with prejudicial infringement of substantial rights * . * * ", citing National Labor Relations Board v. Mackay Radio & Tel. Co., 304 U.S. 333, 351, 58 S.Ct. 904, 82 L. Ed. 1381, and Morgan v. United States, 304 U.S. 1, 19, 58 S.Ct. 773, 999, 82 L.Ed. 1129.

Petitioner complied with the Board's request as to all of the persons for whom it requested subpœnas excepting as to one Grace Stevens. Upon the request for subpœnas under the compliance it did not mention Grace Stevens. It held her name out for the purpose of complaining that it was deprived of her testimony. This procedure did not put petitioner in any better position, in fact, it quite adversely affected it, for the Board had the right to assume that no request was before it regarding a subpœna for her attendance upon the hearing.

### The Findings of Fact.

The next point may be clearly understood by quoting the black faced heading under it in petitioner's brief: "The so-called findings of fact upon which board bases its order are not findings of fact but are admixture of recitation of evidence, argument of the person or persons making the findings, and conclusions of fact not based upon evidence and in utter disregard of material and competent evidence." We need not consider this point for the reason that petitioner does not point to any single instance in the record supporting the assertion. We are not compelled to search the record for undesignated error claimed upon an omnibus assertion.

### Due Process.

The next point is a claim that: "The Board has failed to accord petitioner a fair, full and impartial hearing and in its conduct of the proceedings has denied petitioner due process of law."

The statement under the last preceding point applies as well here.

Petitioner is denied relief, and the order of the Board is ordered enforced.