## UNITED STATES v. BATT.

### No. 2266.

District Court, D. Idaho, E. D.

March 15, 1945.

John A. Carver, U. S. Atty., and E. H. Casterlin and R. W. Beckwith, Asst. U. S. Dist. Attys., all of Boise, Idaho, for plaintiff.

William H. Langroise and S. S. Griffin, both of Boise, Idaho, for defendant.

CAVANAH, District Judge.

The nature of the suit is one wherein the United States seeks to recover the sum of $571.33 as an excise tax for the calendar year 1938, with respect to individuals in the defendant's employ, under Title 9 of the Social Security Act, 42 U.S.C.A. §§ 1101-1109 as then existed.

The defendant answers and alleges that the employment and services, for which wages were paid, were exempt under the Act from the tax imposed, in that the services were "Agricultural Labor".

The facts are stipulated, and the crucial question to be considered is: Does the Act and the facts recognize the interpretation that the services rendered come under the exempt provisions of the Act, and in determining this issue the particular facts of each case must be considered, in order to ascertain what was the intention of Congress in exempting from the operation of the Act "Agricultural Labor".

The plaintiff contends that the services rendered were of a commercial character,

in the field of industry, and not true "Agricultural Labor", while the defendant asserts that the term "Agricultural Labor" must be given a meaning wide enough to include agricultural labor of any kind, as generally understood throughout the United States, in connection with the cultivation of the soil, raising and harvesting crops, including to a variable extent the preparation of the products for consumption, which "processing" is necessary for disposal, by marketing or otherwise.

What then is a fair analysis of the facts here? It requires a consideration of the nature of the activities of defendant, who was a farmer owning, or operating as a tenant, between eight and nine hundred acres of farm land, near Homedale, and Wilder, Idaho, upon which he raised potatoes, onions, lettuce, carrots, peas, and other farm products. He also operated, seasonally, two "processing" sheds, one at Homedale and one at Wilder, located at trackage thereat, and off his farm land. At such sheds he employed labor, during seasons, in "processing" potatoes, onions, lettuce, carrots and peas, raised upon his farms, and other farm producers of similar produce employed him; and his crew, to "process", grade, pack and prepare for market, their produce, and paid for that service.

The individuals, upon whose wages the excise tax is claimed, the contributions made, were employed in processing, grading, packing and preparing for market operations. Approximately 25% of the produce so "processed", graded, packed and prepared for market, was raised and owned by the defendant, and 75% thereof was raised and owned by various farmers, who employed defendant and such labor.

It appears necessary, by reason of Federal and State statutes, and the requirements of the purchasers of produce, to make such produce salable, that each thereof be processed, graded, packed and prepared for market in the manner herein referred to. None of the produce, so handled and processed by the defendant, was sold directly to the ultimate consumer, as he sold all marketable processed produce to track buyers, F. O. B. cars at the packing sheds, who thereupon shipped the same out of the state. Some were sold to jobbers, usually on wire orders received through brokers, and shipped to all parts of the United States, where such jobbers broke up carload lots into smaller lots, and resold to wholesale or retail distributors, and through them to the ultimate consumers; the re-

mainder was sold to what is known as carlot distributors or jobbers, who did not sell to the ultimate consumers. Such produce was not salable, and there was no market for it, without having been so processed, graded, packed and prepared for market, and was not salable in bulk to the ultimate consumers in the condition in which it was in the field, and the United States Government would not purchase the produce, for distribution on relief, unless it was processed.

The equipment employed in the operations was not specialized, but was available generally to farmers, and used on the farms where the produce was produced, and many farmers conducted the operation of processing, packing and grading, etc., on their own premises, in which event the farmers were not charged, and did not pay, contributions on account of the employees engaged therein.

In the section of Idaho, from Twin Falls east to the vicinity of Idaho Falls, Idaho, in respect to potatoes, it was the common practice for the farmers of large acreage to have potato cellars, either on their own premises or elsewhere, and to employ crews of men, who made it their business to go from farm to farm, or cellar to cellar, and use their own equipment, conduct the operations, and receive their compensation from the farmers, upon which compensation no contribution was or need be paid.

In respect to peas, the largest dealers in Idaho grew their own peas, on owned or leased land, and processed their own produce, the processing taking place off such land, in warehouses or sheds available to the tracks, performing the same operation as the defendant, but were not required to and did not pay any contribution with respect to employees engaged in such operations.

Aside from the produce raised by the defendant, the balance of such produce processed was that which the defendant purchased from the farmer-grower and found to be marketable after sorting and grading. The farmers delivered the produce at defendant's sheds, or warehouses, in half bags, as taken by them directly from the field, to enable the defendant and the farmers to determine the part to be purchased and prepared for market. As to potatoes, after they were processed, graded, packed and prepared for market, on consignment, and after the sale, the defendant, in case the farmer delivered the potatoes

from the field, deducted the expenses from the sale price, including the charge for processing, grading, packing, and preparing for market, and a brokerage charge, and the balance was paid to the farmer. As to all the produce, the culls or other non-marketable portions thereof, went back to the farmer producer, or was disposed of as he directed, but did not go into the market.

In the case of peas, lettuce, and carrots, the defendant processed and sold that grown by him, and that which was not grown by him, he handled on consignment for the farmer-owner.

As to each of the products the processing operation was seasonal, at the time of harvesting the crops. In the district where the defendant operated, the harvest began about July 15th and was completed by September 15th. The processing, etc., season as to onions began about August 15th, and continued until freezing, about November 1st, when the operation ended. To a small extent some onions were stored, either as purchased by the defendant or stored by the farmers, in the defendant's storage or elsewhere, and when ready to ship were processed and prepared for shipment. The storage period for onions ended in March. Processing operations on stored onions were not continuous or regular, taking place from time to time as market conditions justified and shipments were demanded, and crews of employees were picked up at the particular time as needed and then discharged.

All operations as to the harvesting, processing, packing, grading and shipping of lettuce are highly seasonal, beginning about October 1st and ending with severe frost about November 1st, and then they ceased.

In the case of carrots, the season's operations run for about one month, from September 15th to October 15th, and as to peas last one month, in June.

The work of employees, in the processing operations as commonly used in the state, did not require any special skill, and the work is largely done by transients, many only staying on the job for a day or two, although others may continue through the particular season. Practically all of the growers of the produce, or the farm help, have the capacity or knowledge to perform any of the operations and type of work. Frequently the person who has been employed on the farm, in harvesting, comes into the processing sheds and is employed in

the processing operation, and frequently a single employee would perform a number of different operations.

The operations which took place at the defendant's sheds, and which constituted "processing", were primarily cleaning, sorting, grading, and packing. The produce of the defendant's farming operations, and the produce of other farmers, were intermingled, and went through the processing, packing, grading and preparing for market, together.

The potatoes would be delivered at the sheds, covered with dirt and intermingled with clods, vines, sticks, culls, and some bruised, cut, rotten and misshaped, just as dug from the ground. The vines and many of the clods were picked out by hand and other dirt screened out, and then were placed in a mechanical washer, partly for the purpose of precooling and partly to clean, and sometimes done by spraying with a hose. After being washed, the produce was placed on tables, where it was hand-sorted, graded and the marketable portion placed in bags and usually branded. After the sacks were sewed they were trucked by hand into the cars, where they were packed and stacked for shipment, and the cars iced. The potatoes discarded or refused went back to the producer, and where the defendant bought the marketable portion, payment was made to the producer on the basis of the marketable portion ascertained.

In case of potatoes, the operation was sometimes done by the farmer himself on his farm, or at other suitable locations, or by traveling crews as part of ordinary farm operations. In case of onions, the same operation took place, except they were not washed. In case of lettuce, delivery was made by the farmer in his own truck, and defendant's crew took over at the shed, where the lettuce was trimmed, and the marketable heads were placed on a table and divided according to size and placed in crates with ice and stamped. The employees also prepared the ice, cleaned up the refuse and checked the amounts. In case of peas, delivery was made from the farm in sacks, contents were placed on a table and sorted, and then placed in hampers or tubs, which were labeled, and, after being placed in a tank of cold water, were taken into the car, and ice placed over the top for refrigeration. In case of carrots, they were tied in bunches on the farm by the farmer producer, placed in crates and

then delivered to the defendant, who then washed, sized, packed, and iced them, as was done with lettuce, and placed in cars.

Since the enactment of the Idaho Unemployment Compensation Law, Laws Idaho 1935, 3d Ex.Sess., c. 12, and subsequent to the year 1938, the defendant here paid to the State of Idaho, under protest, contributions or taxes, computed upon wages for services of individuals employed in connection with the processing operations, etc., here referred to, in the amount of $22,705, and the excise tax claimed by plaintiff on account thereof was $681.15, for 1938, and the defendant paid to the State of Idaho the sum of $613.04, leaving a balance of $68.11, which defendant paid to and was received by plaintiff. Thereafter, defendant here applied to the Industrial Accident Board of the state for a refund of all contributions paid, on the ground that the services and wages were "Agricultural Labor", and exempt under the Idaho law. Proceedings were had in the State Court, wherein the defendant was granted a refund of $571.33, as decided by the Supreme Court of the State of Idaho. P. G. Batt, Appellant, v. Unemployment Compensation Division, Industrial Accident Board of Idaho, 63 Idaho 572, 123 P.2d 1004, 139 A.L.R. 1157.

We are therefore confronted with the specific problem as to what activities are involved here, as disclosed by the facts, in determining whether they come under the interpretation and meaning of the term "Agricultural Labor", as defined by the Ninth Circuit Court of Appeals, for it will be observed that the question has been decided by that Court on several occasions in similar situations, in the cases of North Whittier Heights Citrus Association v. National Labor Relations Board, 109 F.2d 76, and Idaho Potato Growers v. National Labor Relations Board, 144 F.2d 295. In the North Whittier Heights case the Court held that the activity in treating or processing of raw products, and marketing them, enters upon the status of "industry". In that case the petitioner was a corporate body, consisting of farmers, an organized non-profit cooperative corporation, under the law, with a membership of about 200 citrus fruit growers, and engaged in receiving, handling, washing, grading, packing and shipping fruit of its members to market. The Court said [109 F.2d 80]:

"Industrial activity commonly means the treatment or processing of raw products in factories. When the product of the soil leaves the farmer, as such, and enters a factory for processing and marketing it has entered upon the status of 'industry'.

\* \* \* \* \*

"So to be agricultural labor, the work need not be strictly related to the crop, and every work related strictly to the crop is not of necessity agricultural labor and those doing it agricultural laborers.

\* \* \* \* \*

"The opinion in the case of Pinnacle Packing Co. v. State Unemployment Commission, supra, a case arising under a co-operative arrangement for processing and marketing fruit, contains some apt language. We quote: 'The fruit growers who are engaged in the care, cultivation, picking, and delivery of the products of the orchard to be processed, graded, packed and marketed are engaged in agricultural labor and are exempt from the provisions of the statute. As soon as the fruit is delivered by the growers to the plaintiff for processing, grading, packing, and marketing, then the exemption ceases. The plaintiffs engaged in processing, grading, and packing and marketing the fruits are engaged in industry and are, therefore, subject to the provisions of the act and are not exempt as being engaged in agricultural labor.'

"We conclude that the workers in petitioner's packing house are not agricultural laborers and are therefore not exempt from the operation of the Act."

The conclusion reached by the Court in the North Whittier case was adhered to in the recent Idaho Potato Grower case, as the Court held the laborers occupy a similar status.

When we come to consider the status of the growers and the defendant here, as compared with the status of the parties, similarly situated, in the cases decided by the Ninth Circuit Court of Appeals, we find them to be materially the same, and the fact that the grower in the present case operates through the defendant as an individual, and not as a corporation, is not an essential difference; therefore, the conclusion here reached is that the services rendered were of a commercial nature, and an industrial activity, which takes them out of the "Agricultural Labor" exemption provided in the Act.

Attention is called to the decision in the case of Stuart v. Kleek, 9 Cir., 129 F.2d 400, the facts of which show that the type

of work performed was confined exclusively to work upon the farm, and not in processing or marketing the crops raised thereon, and therefore, the facts are not similar to those in the present case.

In 1941 Congress enacted an Act, 42 U.S.C.A. § 409, Subdivision (*l*) (4), broadening the term "Agricultural Labor" to now include "(4) In handling, planting, drying, packing, packaging, processing, freezing, grading, storing, or delivering to storage or to market or to a carrier for transportation to market, any agricultural or horticultural commodity; but only if such service is performed as an incident to ordinary farming operations or, in the case of fruits and vegetables, as an incident to the preparation of such fruits or vegetables for market * * *", which does not apply to the present cause of action, but shows a recognition by Congress of the situation then existing, and the necessity for the remedial legislation, which it passed.

When we come to consider the further contention of the defendant that the Supreme Court of Idaho has held that such services and work were exempt under the Idaho Unemployment Compensation Law, in defining "Agricultural Labor", we find that the decision of the State Court is not binding upon the Federal Court, when in interpretation of the Federal Act is involved, and as the Ninth Circuit Court of Appeals has taken a different view, that is the law in this Circuit.

From what has been said, findings and judgment, in conformity with the conclusion here reached, will be entered, granting to the plaintiff judgment against the defendant in the sum of $571.33, with interest and costs.