[L. A. No. 19074.   In Bank.   Jan. 29, 1946.]

THE IRVINE COMPANY (a Corporation), Respondent, v.
CALIFORNIA EMPLOYMENT COMMISSION et al.,
Appellants.

Robert W. Kenny, Attorney General, Clarence A. Linn and Doris H. Maier, Deputies Attorney General, for Appellants.

Rogers & Clark, John H. Painter and Verne-Marie Freeman for Respondent.

SPENCE, J.—Plaintiff instituted several actions under section 45.10 of the Unemployment Insurance Act (Stats. 1935,

p. 1226, as amended; Deering's Gen. Laws, 1937, Act 8780d) for the refund of certain contributions paid under protest in 1939, 1940 and 1941, upon the theory that the services performed constituted "agricultural labor," and that the 1940 amendment to the commission's rule 7.1 is invalid insofar as it would exclude such services from the concept of "agricultural labor," a base exception under the act. The actions were consolidated for trial, judgment was rendered in favor of plaintiff, and defendants prosecute this appeal.

Respondent owns and operates a large ranch of which some 97,000 acres are used for farming purposes. About 6,000 acres are devoted to citrus fruit and other orchards; about 4,500 acres to grain and field crops; about 60,000 acres to grazing; and about 26,000 acres have been leased to tenant farmers, largely on a share basis, and are used to raise citrus fruits, vegetables, grains and other crops. When respondent acquired this property in 1894, it was used principally as a cattle and sheep range. Over the passing years the productive capacity of the ranch has been gradualy and greatly increased by developing irrigation, draining swampland, washing out alkali and developing a system of soil erosion in various portions of the land. This has required the installation of a large number of electrically operated pumps, and the building of some dams, many miles of canals and pipe lines, roads, and terraces to control the movement of water in certain areas.

Respondent purchases electricity from a power company which is delivered at a single metering point at the edge of the ranch. It has installed and maintains its own distributing system within the confines of the ranch, using the electricity to operate pumping plants and motors and for lighting purposes. Respondent also furnishes electricity to some of its tenant farmers and employees, to some cooperative marketing associations located on the ranch, and to one private concern off the ranch, in that case trading electricity for sewage water. These other users of electricity are charged only the cost thereof, and it is conceded that no profit is made from the arrangement. Respondent's reason for leasing portions of the ranch is that in those cases greater production can be obtained through the closer attention given by share tenants having a personal interest in the crops.

While respondent is principally engaged in agriculture, it operates, or is interested in, a few comparatively small industrial or commercial enterprises, mostly along the ocean, includ-

ing a salt works. Contributions assessed in connection with such activities have been paid, and no controversy exists relative thereto, with the exception of one item which will be considered later. No question is raised here with regard to a large portion of respondent's employees who are engaged in the work of actually tilling the soil, it being conceded that such services are "agricultural labor" within the meaning of the act.

To facilitate its work of preparing the land for cultivation, raising and marketing crops, maintaining buildings and equipment, and keeping records, respondent has, for greater efficiency, arranged a division of labor by assigning special duties to certain of its employees. One group called the "Cummings crew," after its foreman, consists of some twenty men who maintain and operate the irrigation, drainage and reclamation systems.. Specifically, they install, operate and keep pumps in working order, repair dams and ditches, drill some wells, construct terraces, remove silt deposits from orchards, level land in preparation for irrigation, run a portable sprinkler system, and build and maintain private roads over the property to serve ranch purposes. At times they handle some ten different kinds of heavy mechanical equipment requiring some degree of skill, and then again they do miscellaneous work, including the use of a pick and shovel when the occasion arises. Most of these men were ordinary laborers when they joined this crew. In connection with this group's work, respondent employs a surveyor, with occasionally a trained assistant, to determine grades, plan the course for ditches and pipe lines, and perform other services of a similar nature to promote the more efficient operation of the ranch. Another group of workers consists of electricians, who repair and maintain the electric lines on the ranch, do the necessary wiring, and repair and maintain the various motors on the irrigation pumps and in certain tool shops. Still another group consists of carpenters, painters and plumbers. There are 245 large buildings on the ranch and 180 small sheds. These are located generally in twelve units which constitute the various operating centers for the ranch. While all major construction work is done by outside contractors, respondent does maintain a small carpenter shop as a nucleus plant for this group in its work of repairing and maintaining the various buildings and fences on the ranch.

The extensive farm acreage and the diversification of products necessitate the operation of a tremendous amount of mechanical farming equipment, such as tractors, trucks, automobiles, trailers, harvesters, spray rigs, and numerous other machines and equipment, most of which are tractor drawn. Another separate group of workers, consisting of three or four blacksmiths and eight mechanics, are engaged in repairing and maintaining this type of equipment, including the sharpening of tools. And another group of workers consists of bookkeepers, stenographers, a timekeeper, a selling and purchasing agent, and other office help. There are also foremen, superintendents, and managers of various kinds. The trial court found that 85 per cent of the services performed in office work, and of the services of the various supervisors and managers, are essential to and directly connected with the growing of agricultural crops by respondent on this ranch and the farming of the property. The court further found that the work done by all of the other employees above mentioned is necessary and essential to and directly connected with the growing of agricultural crops on this ranch.

The point of special concern on this appeal is the classification of certain specialized services rendered for the most part, not in the actual cultivation of the soil, but in maintaining and keeping in repair the buildings and equipment of the ranch; in caring for and operating the irrigation and reclamation systems; in operating some of the heavier types of farm machinery; in managing, supervising and furnishing supplies and food for the men working the land; in keeping the necessary books and records—all of which work is incidental and essential to the development, cultivation and operation of the ranch.

By its terms "agricultural labor" is excluded from the operation of the Unemployment Insurance Act. (§ 7 (a).) The point of dispute is whether these specialized services should be classified as "agricultural labor" within the import of the statutory exemption. Appellants argue that "the rationale of the agricultural labor exemption is based on the concept of a small family farm"; that respondent's agricultural enterprise, because of its size, should be considered as industrial or commercial in nature; and that the services here involved are such specialized activities as to be, from their very nature, industrial or commercial even when performed on a farm by employees of the owner thereof and in connec-

tion with farming operations. It is further argued that in any event such services do not constitute "agricultural labor" because of a special proviso added in 1940 to the commission's rule 7.1 in connection with its definition of the act's base exception. That provision reads as follows:

Where the nature of the services is such that it might be properly said of the individual performing it that he is pursuing a special trade, calling, or occupation not closely connected with agriculture, the service does not constitute 'agricultural labor' even though the service may be performed on a farm by an employee of the owner or tenant thereof. Typical of such services are those performed by managers, supervisors, foremen, carpenters, painters, blacksmiths, mechanics, or engineers, timekeepers, bookkeepers, or other clerical workers, watchmen, janitors, cooks and gardeners."

This act was adopted as a part of a national plan of social welfare and was designed to work closely with similar federal legislation enacted in the same year, 1935. (*California Employment Com. v. Butte County Rice Growers Assn.*, 25 Cal. 2d 624, 630 [154 P.2d 892]; 42 U.S.C.A., §§ 1101-1110.) Originally, the federal act and the federal administrative definition contained no "special trade" provision. In 1937 and 1939 such a provision was adopted by the federal administrative authorities (Federal Bureau of Internal Revenue, Rulings, 127 S.S.T. 125, C.B. 1937-1397; 423 S.S.T. 368, C.B. 1939-1, Part 1298); yet in three cases where the question of classification arose with reference to services performed during those years, it was held that persons employed by farmers and for farm purposes were engaged in agricultural labor even though it might properly be said that they were pursuing special trades. (*Jones v. Gaylord Guernsey Farms,* 128 F.2d 1008; *Stuart v. Kleck,* 129 F.2d 400; *Latimer v. United States,* 52 F.Supp. 228.) These federal decisions, in effect, reject, without express mention, the "special trade" provision as out of line with the broad policy of exclusion envisaged by Congress in its use of a term of as general import as "agricultural labor"—a term "intended . . . to have a meaning wide enough and broad enough to cover and embrace agricultural labor of any and every kind, as that term is understood in the various sections of the United States where the act operates . . . [as] its generality reasonably extends to. Definitions of agriculture in standard texts and treatises and

in decisions in these latter years, have had the widest content. . . . An examination of the cases cited in Words and Phrases, Fifth Series, Vol. 1, p. 339 et seq., under 'agriculture' and in 3 C.J.S., Agriculture, pages 361, 365 and 366, sec. 1, under 'agricultural' and 'agriculture', convinces that in modern usage this is a wide and comprehensive term and that statutes using it without qualification, must be given an equally comprehensive meaning." (*United States* v. *Turner Turpentine Co.*, 111 F.2d 400, 404-405.)

The governing factors entering into the decision of the three above cited federal cases, which project in bold relief the comprehensive interpretation given to the statutory exception of "agricultural labor" under the federal act, despite administrative limitations sought to be engrafted upon the term, recommend their brief review at this point. In *Jones* v. *Gaylord Guernsey Farms, supra,* a large dairy enterprise was involved, and among the challenged services performed for the owner of the dairy farm were those of the carpenters, whose "duties consisted of building and repairing sheds and fences, as well as doing repair work generally." With respect to these services it was aptly said at page 1011: "Repairing fences and buildings is a necessary incident to actual farming operations. Without fences, cattle cannot be raised, and without barns and granaries which will hold the grain, there would be no object in planting or harvesting it." (Likewise in *Stuart* v. *Kleck, supra,* at page 403, the exemption was held to attach to "services performed" by "employees . . . actually employed on a farm in preparing land for the planting of agricultural crops thereon; in seeding the lands; in constructing dams and reservoirs for impounding water to be used for watering livestock; and in operating farm machinery in connection with the work." In passing, it should be noted that the Kleck decision was made without regard to the status of the employer—there an independent contractor furnishing employees to various farmers to perform the services mentioned, while here the owner of the land having its own employees do the work on its farm—a fortifying distinction in favor of respondent.

And finally, in *Latimer* v. *United States, supra,* the scope of the exception was considered in relation to work done by employees of Rancho Sespe, a corporation operating a 4,100-acre ranch devoted in the main to citrus fruit growing. As noted at page 232, "the ranch had . . . 250 to 400 employees,

who lived in the ranch village, or in neighboring towns. On the ranch there were located blacksmith shops, carpenter and paint shops, implement sheds and packing sheds.'' So far as here pertinent, the disputed services were those performed by the blacksmith ''who shod horses and repaired the various farm implements''; the carpenters ''who repaired the ranch buildings, made drying trays, hayracks, and did some mechanical work''; and the mechanics ''who maintained the automotive equipment of the ranch tractors and gas engines, consisting of about fifty machines, including automobiles and spray machines and who also helped in general farm operations.'' All these employees worked full time for the ranch. In considering the classification of these services, the court at page 236 refers first to the case of *Jones* v. *Gaylord Guernsey Farms, supra*, as authority for holding the carpenters to be engaged in ''agricultural labor.'' It then continues: ''There is no reason for excluding mechanics on the farm from being 'agricultural' workers if carpenters on the farm are so classified. Their work in maintenance of farm machinery is as incidental to farming operations as is the upkeep of a shed or the repair of a hayrack on the farm. The dominant purpose and business of Rancho Sespe was farming citrus products and the fact that it engaged in correlated activities, all, however, being incidental to farming and all on the farm, in no way changes the 'agricultural' aspect of the functions of the plaintiff Rancho Sespe. The size of the rancho and the utilization of mechanical instrumentalities of agriculture do not require that its operations be classified as manufacturing or commercial activities. They still remain ordinary farming operations within the ordinary meaning of the term and within the meaning of the regulations.''

To continue with the chronology of pertinent legislation— in 1939, Congress amended the federal act and provided that services ''In the employ of the owner or tenant or other operator of a farm, in connection with the operation, management, conservation, improvement, or maintenance of such farm and its tools and equipment'' should be considered ''agricultural labor.'' (42 U.S.C.A., § 1107; transferred in 1939 to Internal Revenue Code, 26 U.S.C.A. Int. Rev. Code, § 1607.) To conform to this definition an administrative rule was adopted repeating substantially this language and providing that such services may include, for example, those performed ''by carpenters, painters, mechanics, farm super-

visors, irrigation engineers, bookkeepers, and other skilled or semi-skilled workers which contribute in any way'' to the management and conduct of a farm which is operated by the person employing them. (§ 403.208 U.S. Treas. Regs. 107, effective January 1, 1940.)

In 1943, the Legislature of this state passed a bill, one of the purposes of which was to amend section 7 of our act so as to define agricultural labor in conformity with the federal definition and in such a way as to·include, as agricultural, special services which contribute to the conduct of a farm operated by the employer. (Assembly Bill No. 347, 55th Session of the California Legislature.) This bill was vetoed by the Governor. In 1945, the Legislature passed another bill, one of the purposes of which was to classify such special services as agricultural if performed ''in the employ of the owner or tenant of a farm'' and ''as incident to ordinary farming operations.'' (Senate Bill No. 615, 56th Session of the California Legislature.) It was pocket-vetoed by the Governor. Though these bills failed to become law, the legislative action in connection with the subject under discussion is of some significance as evidencing the continuity of legislative intent regarding the use of the broad term ''agricultural labor.''

The commission's rule purporting to define the term ''agricultural labor,'' as unexpanded in the state act, was changed five times between 1936 and 1940. The commission's varying constructions of that term have been ''neither uniform nor of long standing'' (cf. *Whitcomb Hotel, Inc.* v. *California Employment Com.*, 24 Cal.2d 753, 758 [151 P.2d 233, 155 A.L.R. 405]) and, as above noted, legislative action subsequent to the commission's 1940 ''special trade'' ruling has evinced disapproval, rather than approval, of such limitation. Moreover, as indicating further vacillation in administrative interpretation of the term, in a letter dated November 10, 1939, an employee of the commission advised respondent's counsel that ''. . . it appears to be a well settled point of law in this state that any person who is performing services on a farm and contributing to the operation of the farm is engaged in 'agricultural labor,' regardless of the fact that due to the size of the farm and the use of modernized equipment his services are highly specialized. . . .''

The only case parallel in statutory and administrative considerations that counsel have cited, and independent re-

search has revealed, is *Equitable Life Insurance Co.* v. *Iowa Employment Sec. Com.*, 231 Iowa 889 [2 N.W.2d 262, 139 A.L.R. 885]. There the question of the interpretation of the term "agricultural labor" arose in connection with the propriety of a claim for benefits under the Iowa Employment Security Law. The decision expressly turns on the factual situation as recited at page 263: "Equitable Life Insurance Company of Iowa, through foreclosure of mortgages . . ., had secured a number of farms which . . . it was trying to sell as rapidly as possible and in the meantime was leasing to various tenants. To make these farms more rentable and salable, the Equitable engaged a crew of men which went from farm to farm making repairs, improvements and replacements of buildings thereon. [For six years] claimant . . . had worked for the Equitable as a member of such crew, being paid by the hour. His work was principally that of a carpenter, consisting of constructing houses, barns, cribs and other buildings upon the farms and repairing and improving old buildings thereon. He also worked at excavating for several foundations, putting in the foundations and a few odd jobs of painting. His work did not include tilling or cultivating the soil or harvesting crops or the building of fences."

The Iowa Commission's definition of "agricultural labor" contained a "special trade" provision in substantially the same language as is here involved. In applying such provision to the facts before it, the court held that "claimant's employment was not 'agricultural labor' as . . . defined." However, in reaching its decision it is significant that the court at page 266 [2 N.W.2d] "observed that none of the work done by claimant in the case at bar was incident to ordinary agricultural labor. Such service was more incident to the business of the insurance company of preparing the farms for early sale and in the meantime renting them to better advantage." This clear-cut factual distinction detracts from, rather than adds to, appellants' position, for it must be remembered that the services here in question were performed on the farm by employees of the owner of the farm, as part of the owner's regular farming operations, and for the sole purpose of producing and marketing crops. The distinctive factor in classification is noted in *State* v. *Christensen*, 18 Wn.2d 7 [137 P.2d 512, 520, 146 A.L.R. 1302], as follows:

"The courts . . . have had difficulty with this type of case,

and some of this difficulty . . . has, in our opinion, arisen because the courts have attempted to pick out some particular phase of the operation as determinative of whether it was agricultural, industrial or commercial, instead of looking primarily to the main general purpose of the operation."

Prior to the enactment of our Unemployment Insurance Act the term "agricultural labor" had been construed in the leading case of *Miller & Lux, Inc.* v. *Industrial Acc. Com.* (1919), 179 Cal. 764 [178 P. 960, 7 A.L.R. 1291], to include services performed by an employee of a farmer in connection with farming operations, even though it might be said that the employee was "pursuing a special trade, calling or occupation." The case arose under the Workmen's Compensation Act, which excluded from its operation persons engaged in "farm, dairy, agricultural, viticultural or horticultural labor." The single question for decision was stated at page 766 to be "whether or not a workman, whose sole duty is to repair wagons in a shop operated on a farm for the purpose of keeping the agricultural implements and vehicles used on the farm in order, is engaged in farm or agricultural labor within the meaning of" said act. At page 767 the court said: "The law of California has exempted the farming industry from the operation of this statute, and if a worker upon a farm may be reasonably classified as one engaged in agriculture, his employer is clearly entitled to the benefit of this exemption. While it is true that an employer may be engaged in several sorts of industry, some of them within and some of them without the purview of the Compensation Act, and that an employee may at different times do work of one kind or the other, it is equally a fact that where from the great extent and complexity of farming operations on a given rancho, the work of the farmers is classified and each is given a limited, rather than a diversified duty, that circumstance alone will not make some of them artisans rather than agriculturists. Numerous illustrations suggest themselves. If the mower who stops to use a whetstone on his scythe remains a farmer, is the boy who is set to work sharpening all the farming tools used on the place engaged in an occupation entirely outside of farming? Clearly not." And at page 769 the court in the course of its review of pertinent cases from other jurisdictions noted that "while the authorities . . . are somewhat in conflict, the weight and the better reasoning support the contention . . . that the repairing of

farming machinery on the farm, in a shop devoted to such repairs, is an agricultural pursuit.''

While differences in nature, reason and purpose, as well as in statutory details, between workmen's compensation and unemployment compensation laws necessarily detract from the assistance that otherwise might be afforded through unqualified interchangeable application of the decisions in the respective fields as to the import of the common exemption ''agricultural labor'' (*H. Duys & Co.* v. *Tone,* 125 Conn. 300 [5 A.2d 23, 27-28]), yet where proper, a general pervading principle of interpretation would be of material assistance in construing common language found in the provisions of acts operating in the two fields. Consistent with this observation, it is reasonable to assume that the Legislature, in using the broad term ''agricultural labor'' as a base exemption under our Unemployment Insurance Act, was cognizant and took account of the meaning ascribed to that term under our Workmen's Compensation Act as discussed some sixteen years earlier in the Miller & Lux case, *supra.* (*Carroll* v. *California Horse Racing Board,* 16 Cal.2d 164, 168 [105 P.2d 110]; *Marculescu* v. *City Planning Commission,* 7 Cal.App.2d 371, 375 [46 P.2d 308].)

Moreover, and as an independent consideration, it is a settled principle of statutory construction that a Legislature in legislating with regard to an industry or an activity, must be regarded as having had in mind the actual conditions to which the act will apply; that is, the customs and usages of such industry or activity. At the time the Unemployment Insurance Act was adopted in this state in 1935, there were many large ranches producing agricultural crops by the employment of mechanized equipment, with a division of labor, and by using irrigation, reclamation and drainage. When then, the Legislature, in adopting the language of the act, created an exception by use of the general term ''agricultural labor,'' it must have had the large ranches in mind as well as the smaller farms; and while the base words are not defined in the act, they are also not limited, so that it is unreasonable to suppose that it was intended to narrow the exemption to small farms or to hand labor or to any particular part of the labor then being generally used on ranches and farms by the owners or tenants thereof. It is easy to say that a carpenter remains a carpenter, a mechanic is still a mechanic,

and a bookkeeper continues to be a bookkeeper no matter where or for whom he is working—thus isolating the individual from the overall employment of which he is a part. But it must be remembered that the problem at hand is the meaning of a particular statute. ██ The act does not include or exclude a carpenter because he is a carpenter or an unskilled laborer because he is such. Irrespective of his particular trade or skill, it is the work that he is doing and the circumstances under which he does it that brings him within or without the provisions of the act. If his services are performed on a farm while a regular employee of the owner or tenant of the farm, and if such services are essential for the purpose of producing agricultural crops under the system of work established in furtherance of that purpose, such services must be classed as ''agricultural labor'' regardless of the fact that the particular services of such employee might ordinarily be classed otherwise if performed under different circumstances.

Agriculture, like industry, has developed, changed and grown under modern conditions incident to the adoption of new methods and the advent of improved machinery, including the use of electrical power and the internal combustion engine. This has also brought about, in some cases, changes in the methods and ways of doing the necessary work in carrying on agricultural operations. While, of course, there still exists the small farm operated mainly by hand labor and horse-drawn implements, the use of power machinery and more varied equipment is now general on large and medium-sized farms, and to some extent even on smaller farms. A large part of agricultural production now takes place on large farms, the efficient operation of which would, in many instances, have been impossible a generation ago, and which systematically utilize modern methods and machinery. But despite such changes in methods and means of operation, they still are agricultural enterprises and are operated for the purpose of producing agricultural crops. ██ It may fairly be said that the determinative consideration here is whether the act in question contemplated ''agricultural labor'' under the conditions then actually existing and well known to the Legislature, and as broadly applying to the business of agriculture in its entirety, or whether the general exemption was intended to be limited to ''agricultural labor'' under primitive conditions or as pursued a century or more ago, and to

apply only insofar as those conditions and methods may still survive. Reasonably viewing the generality of the term, it would seem that it was intended to cover and apply to the conditions prevailing when the act was adopted and under which agriculture now flourishes throughout the state.

To the extent that this classification would include as "agricultural labor" within the meaning of the act, various clerical and administrative workers on respondent's ranch whose services were directly concerned with the business of keeping records of crop production and with the management and supervision of the farming enterprise, our decision is contrary to some of the views expressed in *Jones* v. *Gaylord Guernsey Farms,* 128 F.2d 1008, 1011, and *Latimer* v. *United States,* 52 F.Supp. 228, 237. But there seems to be no reasonable basis for distinguishing that type of specialized service from any other "special trade, calling or occupation" which constitutes an integral part of an entire agricultural enterprise and is essential to its efficient operation. In this regard the rationale of the case of *Application of Butler,* 258 App.Div. 1017 [16 N.Y.S.2d 965], is pertinent. There the court was construing the term "farm labor" under the New York Unemployment Insurance Law—a term which is universally acknowledged to be more restrictive than "agricultural labor." The farm in question consisted of 470 acres and the principal business was the production and sale of milk from the dairy enterprise. In holding the employees to be "farm laborers" and so within the statutory exemption, the court aptly said at page 966 [16 N.Y.S.2d]: "*Farming, when conducted in a business-like manner, does not lose its identity. An employee who keeps records concerning the production of farm produce and its sale is engaged in tilling the soil as well as the employee who stirs the surface of the earth with a hoe. The acts are interrelated and on a farm of the size owned by this employer, conducted as he conducted the business, the scrivener and accountant are as necessary as the cultivator.*" (Italics added.)

Consistent with these observations, the trial court properly concluded, with respect to the several groups of respondent's employees under discussion, that insofar as rule 7.1 "purports to exclude from the classification of 'agricultural labor' work which is necessary and essential to and directly connected with the growing of agricultural crops

upon plaintiff's said ranch and other similar ranches, it is unreasonable and arbitrary and discriminates against plaintiff and against others engaged in operating large ranches in this state.''

■ Appellants further contend that the trial court erred in holding as exempt from the operation of the act certain services performed by some of these employees of respondent on land leased by it to tenants, mostly on a crop-sharing basis. These services consist of work in connection with the drainage and reclamation of the land to make it more productive, for which no charge is made, it being a part of respondent's general program of improving the ranch; of operating a ''rain-making'' sprinkler system for irrigation, and making certain repairs where the tenant has no facilities for doing the work and for which a nominal charge is made to defray costs; and work performed in harvesting tenant-grown grain on a cost basis.

Where a landlord leases part of its land to increase its own agricultural production, such leasing is deemed an agricultural function. (*State* v. *Nelson,* 145 Minn. 123 [176 N.W. 164]; *Criger* v. *Mustaba Investment Co.,* 224 Iowa 1111 [276 N. W. 788]; *Smythe* v. *Phoenix,* 63 Idaho 585 [123 P.2d 1010]; *First National Bank & Trust Co.* v. *Beach,* 301 U.S. 435 [57 S.Ct. 801, 81 L.Ed. 1206].) For example, in the last-cited case the status of Beach was considered in relation to the Bankruptcy Act, which defines a farmer as ''any individual who is personally bona fide engaged primarily in farming operations or the principal part of whose income is derived from farming operations.'' Beach owned a farm where he lived and engaged in farm production work; however, he rented three-fourths of the farm for grazing and cultivation, and the rentals constituted the greater part of his income. It was held that Beach was ''primarily engaged in farming'' though his income receipts from his own operations on the farm were scant; that he did not step into another business because he leased land to tenants for farm work. Thus the court said at page 440: ''. . . the farming is still the business; the leases are then investments, more profitable than the business but leaving it unchanged.''

Appellants argue that by leasing part of its land to agricultural tenants for cultivation, respondent is performing a commercial function and the farm services performed by respondent's employees for the tenants lose their agricul-

tural character when furnished in pursuance of a commercial operation. For this proposition they cite such cases as *North Whittier Heights Citrus Assn.* v. *National Labor Relations Board,* 109 F.2d 76, and *Equitable Life Insurance Co.* v. *Iowa Employment Sec. Com., supra,* 231 Iowa 889 [2 N.W.2d 262, 139 A.L.R. 885], which are clearly distinguishable on their facts. In the first case cited, the services found to be nonagricultural were packing-house activities which were performed in processing for market already-harvested products grown by other employers on farms not owned by the employer in question. No landlord-tenant relationship was present. In the second case cited and above reviewed, while the landlord-tenant relationship existed, the purpose of the insurance company as the landlord-employer, in furnishing its carpenter and building crew to make repairs and improvements on the leased farms, was to maintain its real estate investment until it could be liquidated—totally unconnected with farm production. In contrast are the services furnished by respondent's employees to its farm tenants in furtherance of their cultivation of the land and harvest of their crops so as to increase the entire output of respondent's agricultural enterprise. Moreover, as a practical matter from the record here, the exemption operates under section 7(1) (10) of the act, which provides that where an employee performs two kinds of services, the classification shall be based upon the one in which more than half of the time is spent in a given period.

Finally, there is a controversy with respect to one item relating to the operation of the salt works, a nonagricultural activity. One Madrid furnished certain men for work in this connection. In relieving respondent from liability for tax contributions under the act for wages paid to these men, the court found that Madrid was an independent contractor, and that the men were not employees of respondent. Appellants contend that this finding is not supported by the evidence, but the record does not sustain their position.

The work consisted in shoveling salt into cars and payment was made at a fixed rate per ton. The men were not on respondent's payroll, but the money therefor was all paid to Madrid, who then paid it to the men as they decided upon the distribution among themselves. Madrid paid the premiums for carrying workmen's compensation insurance on the men, and he furnished them with living accommodations

at his "boarding-house" and with transportation to different parts of respondent's ranch according to the work assignment. There is evidence that the only instructions given to these men by respondent were as to the place where they should work, and that no instructions were given as to the method of doing the work.

While appellants point to certain portions of the record as supporting their position in challenge of Madrid's status as an independent contractor, such testimony created no more than a conflict in the evidence and the possible inferences that might be drawn by the trial court as the trier of the facts. Under these circumstances the trial court's finding with respect to Madrid's status will not be disturbed. (*S. A. Gerrard Co.* v. *Industrial Acc. Com.*, 17 Cal.2d 411, 414 [110 P.2d 377]; *Lee* v. *Nanny*, 38 Cal.App.2d 90, 94 [100 P.2d 832].)

The judgment is affirmed.

Gibson, C. J., Shenk, J., Edmonds, J., Carter, J., Traynor, J., and Schauer, J., concurred.

Appellants' petition for a rehearing was denied February 25, 1946.