[L. A. No. 19333. In Bank. Jan. 29, 1946.]

CALIFORNIA EMPLOYMENT COMMISSION, Appellant,
v. JOHN KOVACEVICH, Jr., as Administrator, etc.,
Respondent.

Robert W. Kenny, Attorney General, Clarence A. Linn and Doris H. Maier, Deputies Attorney General, Forrest M. Hill, Ralph R. Planteen and Miriam E. Wolff for Appellant.

Iener W. Nielsen and Calvin H. Conron, Jr., for Respondent.

Ivan G. McDaniel as Amicus Curiae, on behalf of Respondent.

SPENCE, J.—This is an action to recover contributions claimed to be due under the Unemployment Insurance Act (Stats. 1935, p. 1226, as amended; Deering's Gen. Laws, 1937, Act 8780d) upon the basis of wages paid employees by John Kovacevich, Sr., during the years 1939 and 1940.

John Kovacevich, Sr., who has since died, was engaged in the business of packing and shipping grapes and plums, operating under the name of "The Arvin Fruit Distributors." He handled no fruit except his own. He owned no land during 1939 but bought some late in 1940. Most of the fruit that he handled was obtained by purchasing the crops of various growers under contracts by which he agreed to buy, and the owner of the land agreed to sell, the crops on the land for that year at a fixed sum payable in installments, the last installment being due about harvest time. Under most of the contracts Kovacevich undertook to do the "girdling, thinning and harvesting" at his own expense and the seller agreed to do the cultivating, irrigating and other farm labor, but under a few of the contracts Kovacevich also undertook to do the pruning and irrigating or other parts of the work of raising the crops. Each of the contracts was made between January and May of the year in which Kovacevich purchased the particular crop covered by such contract.

Kovacevich operated in Arvin a packing house, conveniently located in relation to the various ranches and containing the usual machinery and equipment, at which he packed and loaded the fruit on cars for shipment. On his payroll records, his employees were divided into three general classifications: (1) "packing house labor," covering employees

engaged in packing and shipping the fruit; (2) "field labor," covering those employed in picking and harvesting and such other services as were performed on the various farms; and (3) "office help." The assessment of contributions here involved was based upon the wages paid to employees in all of these classifications, and the record fails to show the exact amounts paid to the employees in each of the respective classes.

The trial court adopted defendant's theory that in operating this business Kovacevich was not acting as a commercial packer or shipper but was packing and shipping his own fruit which he had grown and harvested, that his activities concerned solely the growing and marketing of his own produce, and that the entire enterprise was exempt from contributions under the act in question. Accordingly, judgment was entered in favor of defendant and plaintiff commission prosecutes this appeal.

Appellant takes the position that none of the services here involved—either in connection with growing or picking the fruit or in connection with packing and shipping it—constitutes "agricultural labor" within the purport of section 7(a) of the act nor within the meaning of rule 7.1 adopted by the commission as an administrative aid in defining the term; that most of these services were performed at the packing house and removed from the farms; that the remainder was closely connected therewith and essential thereto; that Kovacevich was engaged in an entrepreneurial enterprise, commercial rather than agricultural in character; that he purchased crops from various farms but was not a tenant of those farms; that such work as he did on the land was directed solely to the furtherance of his commercial enterprise of getting fruit of a better quality and of earlier maturity, adding "buyer appeal" to the produce shipped to market; that such work was not done for the owners or tenants of the farms; and that such work was done not as an incident to ordinary farming operations but as an incident to a commercial undertaking. It is further argued that this act, as an unemployment insurance measure, is remedial in character and should be liberally construed to the end that its coverage and benefits be extended to as many workers as possible.

While it is true that such legislation should be liberally construed so as to afford all the relief which the language of the act indicates that the Legislature intended to grant

(*California Employment Com.* v. *Butte County Rice Growers Assn.,* 25 Cal.2d 624, 630 [154 P.2d 892]), the interpretation should not exceed the limits of the statutory intent. By section 7(a), the Legislature has expressly excepted ''agricultural labor'' from the operation of the act, without limiting or defining the term. In *Stuart* v. *Kleck,* 129 F.2d 400, a case involving the consideration of comparable federal legislation, the Social Security Act, in relation to the classification of farming services performed by employees of an independent contractor, the court said at page 402: ''When the Congress . . . made use of the broad term 'agricultural labor,' this expression, used by itself, must be given a meaning wide enough to include agricultural labor of any kind, as generally understood throughout the United States.'' And further, at pages 402-403: ''Accordingly, the exemption attaches to the 'services performed,' which refers to the type of work that is being done, and is not dependent on the form of the contract or whether the employee is employed by the owner or tenant of the farm or an independent contractor.'' ██ Similarly, our statute refers in general terms to the type of work in excepting ''agricultural labor'' and makes no reference to the status of the employer. It recognizes that the same employee may be engaged in both industrial and agricultural work and provides in section 7(1) (10) that his classification shall be determined by the kind of service in which he spends the greater part of his time. In view of the express statutory intent to except ''agricultural labor,'' any labor which is essentially agricultural in nature, and which cannot be otherwise regarded by reason of any change in the custom of doing it, should not be included within the operation of the act by administrative or judicial legislation under the guise of liberal interpretation.

This distinct concept based upon the kind of service performed and its locale is recognized by the language and arrangement of the commission's rule 7.1 defining ''agricultural labor.'' The commission adopted this rule effective February 14, 1937, which was in force during the period here involved. So far as here material, the rule defined the term ''agricultural labor'' to include all services performed:

''(1) By an employee on a farm, in connection with the cultivation of the soil, the raising and harvesting of crops, the raising, feeding, management of livestock, poultry and bees; which includes, among others, the spraying, pruning,

fumigating, fertilizing, irrigating, and heating which may be necessary and incident thereto;

"(2) By an employee in connection with the drying, processing, packing, packaging, transportation, and marketing of materials which are produced on the farm or articles produced from such materials, providing such drying, processing, packing, packaging, transporting, or marketing is carried on as an incident to ordinary farming operations as distinguished from manufacturing or commercial operations.

"The services hereinabove set forth do not constitute agricultural labor unless they are performed by an employee of the owner or tenant of the farm on which the materials in their raw or natural state were produced. Such services, however, do not constitute agricultural labor if they are carried on as an incident to manufacturing or commercial operations."

To analyze the definition of "agricultural labor" in rule 7.1, it will be observed that subdivision (1) embraces all services performed *on the farm* "in connection with the cultivation of the soil, the raising and harvesting of crops"; and that subdivision (2) embraces services "in connection with the drying, processing, packing, packaging, transporting or marketing of *materials . . . produced on the farm,*" providing certain conditions are met but without regard to place of performance. The conditions are stated in two paragraphs. The first paragraph provides that the enumerated services in connection with "materials . . . produced on the farm" are exempt only if they are "carried on as an incident to ordinary farming operations." The second paragraph contains the additional proviso that the services "herein above set forth" must be performed "by an employee of the owner or tenant of the farm on which the materials . . . were produced." Placed together in a separate subdivision designated (2), each paragraph of that subdivision refers to materials as completed things, and to the farms on which they were *produced;* and both relate to the same matter—the handling and treatment of materials which have already been produced. The most reasonable interpretation of the language and arrangement of rule 7.1 is that the second paragraph of subdivision (2) relates only to the same kind of activities described in the first paragraph of that subdivision —the handling of agricultural commodities which have already been produced or harvested. This is especially true

since subdivision (1) had already clearly and definitely covered all services on a farm up to and including the harvesting of crops.

This analysis coincides with the application of said rule 7.1 in its 1937 form as discussed in the recent case of *California Employment Com.* v. *Butte County Rice Growers Assn.*, 25 Cal.2d 624 [154 P.2d 892]. There the problem of construction arose in connection with the classification of employees of a farmers' cooperative association operating a warehouse located near a railroad siding for the storage of rice and grain for shipment to market—services falling wholly within subdivision (2) of the rule as being performed off the farm following the harvesting of the crops. It is there said at page 636: "Concededly, the services performed by the defendant's employees are *not* 'on a farm' and so do not meet the specification of subdivision (1) of said rule. Equally exclusive is the plain language of subdivision (2), for it requires that services rendered 'in connection with the drying, processing, packing, packaging, transportation, and marketing of materials which are produced on the farm' be *'incident to ordinary farming operations as distinguished from manufacturing or commercial operations'* and be *'performed by an employee of the owner or tenant of the farm.'* (Italics ours.) Thus, to come within the 'agricultural labor' exemption, *off the farm* services must be an integral part of farming operations performed for the farmer as such—*not for a third person* separate and apart from such fundamental concept."

The significance of the quoted language is its emphasis of the rule's division of services into two categories: [1] services mentioned in subdivision (1), which are essentially agricultural under all circumstances because the services are performed "on a farm, in connection with the cultivation of the soil, the raising and harvesting of crops"; and [2] services mentioned in subdivision (2), which are not essentially agricultural under all circumstances because such services are performed after the harvesting of the crops, and such services may or may not be performed on the farm, may or may not be performed by employees of the owner or tenant of the farm, and may or may not be performed "as an incident to ordinary farming operations as distinguished from manufacturing or commercial operations." ▪ As we interpret the rule, the services mentioned in subdivision (1) constitute "agricultural labor" regardless of who may be

the employer of the person performing such services, while the services mentioned in subdivision (2) constitute "agricultural labor" only in the event that such services are performed by employees of the "owner or tenant of the farm" and as an "incident to ordinary farming operations." In other words, the limitations of the second paragraph of subdivision (2) of the rule should not be interpreted, as the commission contends, to relate to subdivision (1) of the rule, so as to exclude from the classification of "agricultural labor" the services there mentioned when not performed by the employees of the owner or tenant of the farm. In the Butte County Rice Growers case, *supra,* it was deemed entirely reasonable for the commission to enact a rule providing that services following the harvest should be excluded from the classification of "agricultural labor" when not performed by an employee of the owner or tenant of the farm; and it was only upon this basis that this identical rule 7.1 was approved as a valid exercise of the power of the commission to "fill up the details" by adopting "a practical, workable definition in amplification of the unexpanded statutory exemption" covering "agricultural labor." (*California Employment Com.* v. *Butte County Rice Growers Assn.,* 25 Cal.2d 624, 632 [154 P.2d 892].)

Under any other interpretation this rule would amount to unauthorized legislation by the commission, in that it would purport to restrict the meaning of the expression "agricultural labor" used by the Legislature in the act itself. (Sutherland, Statutory Construction, 3d ed. [Horack], vol. 2, § 4002, p. 276; *Hodge* v. *McCall,* 185 Cal. 330, 334 [197 P. 86].) "Agriculture," says Webster's New International Dictionary, Second Edition, is "the art or science of cultivating the ground, and raising and harvesting crops. . . ." Such statement of the common understanding of the term manifestly does not envisage consideration of whether or not the services are performed by employees of the owner or tenant of a farm in determining whether or not such ordinary field activities, up to and including the harvest, constitute "agricultural labor." ██ An administrative agency may not, under the guise of its rule-making power, exceed the scope of its authority and act contrary to the statute which is the source of its power. (*California Drive-In Restaurant Association* v. *Clark,* 22 Cal.2d 287, 302-303 [140 P.2d 657, 147 A.L.R. 1028].)

Moreover, our act was adopted as a part of a national plan of social welfare and was designed to work closely with similar federal legislation. (*California Employment Com.* v. *Butte County Rice Growers Assn.*, 25 Cal.2d 624, 630 [154 P.2d 892].) It is even provided, in section 2 of our act, that a change in the national legislation or in the interpretation placed thereon shall, under some circumstances, affect the requirement for contributions under our act. In 1939 the Federal Social Security Act was amended by Congress so as to define as agricultural labor "all service performed on a farm, in the employ of any person, in connection with cultivating the soil, or in connection with raising or harvesting any agricultural . . . commodity. . . ." (26 U.S.C.A. § 1607(c) subsec. (1).) Before that amendment the federal act, like ours, merely contained the unexpanded statutory exemption of "agricultural labor" and the term was defined by Treasury Regulation 90, Article 206, February, 1936, in substantially the same language as that found in our rule 7.1 as above quoted—subdivisions (1) and (2) of our rule paralleling subdivisions (a) and (b) of the federal regulation, the only difference being that the limitation stated in the second paragraph of our subdivision (2) with respect to the qualifying requirement that the services be "performed by an employee of the owner or tenant of the farm" appears as the second sentence of subdivision (b) of the federal regulation.

A number of federal cases, in applying the federal regulation, have recognized that there was a line of demarcation to be drawn after the crops had been harvested, and that services performed prior to the completion of the harvest in producing and harvesting all crops were essentially agricultural. In *Stuart* v. *Kleck*, 129 F.2d 400, employees of an independent contractor performed for various farmers such services as preparing the soil for the planting of agricultural crops and seeding the lands—essentially farming operations. The argument was advanced that "the statute was restricted by the Regulations so that these employees" did "not come within the exemption because they were not in the employ of the owner or tenant of the land on which the services were performed." In rejecting such claim the court said at page 403: "This sentence [the owner-tenant employment requirement] is no part of (a) in its text, but is a part of the next paragraph (b), where the connection makes sense. From the

language it unmistakably appears that it was not intended to apply to paragraph (a) which is not concerned with the processing of articles from materials which were produced on a farm. These activities are covered exclusively in (b), which deals with the products of the farm after they have been gathered.''

In line with these observations is *Latimer* v. *United States,* 52 F.Supp. 228, where the court considered such services as ''plowing, discing, planting, cultivating, irrigating, root cutting, spraying, pruning, dusting, fumigating, and other cultural and maintenance labor.'' The 'court there said at page 234: ''All of such specified services directly and inherently pertain to the farm or orchard. These activities connote true 'agricultural labor.' They are inseparably attached to and associated with the cultivation of products of the soil. The fact that the services are rendered by employees of an entity other than the owner or tenant of the orchard is of no consequence, as the controlling part of the regulations is paragraph (a) thereof, which contains no requirement as to the status of the employer of the one doing the work specified. It is the kind of work done and the locale of it which controls under the Regulations.'' And continuing at page 235: ''It is all done in the grower's orchard, in other words, on the farm, and it all precedes delivery of the fruit for processing or marketing purposes. Thus the stage of operations at which such services cease to be an incident to ordinary farming and become incidental to the commercial operations of the packing house is reached after the fruit has been picked and upon actual delivery of the fruit to the employees of the association for transmission to the packing house.''

And in *Lake Region Packing Assn.* v. *United States,* 146 F.2d 157, the federal statutory exemption was considered in relation to a cooperative marketing association ''which, through its employees, performed for its members the labor required to cultivate, pick, haul to market, package, process and market their fruit.'' The court commented on the distinctive features of this situation as follows, at pages 159-160: ''The statute exempts agricultural labor. To hold that the cultivation of the fruit was, and its picking, assembling

and hauling was not, agricultural labor will not do. The statute contains no such limitation. Neither does the regulation relied on to impose one contain it. It expressly declares that agricultural labor includes both the cultivating and the harvesting of the crops . . . it is quite clear that here is a case not of packing, processing and marketing as incidental to ordinary farming operations, but one, the essence of which was a commercial operation. Because this is so, those acts, which were not performed in the field or in connection with getting the product from the field to the place of processing and were therefore not per se agricultural, are deprived of their agricultural character by the dominance in the operation of their commercial character.''

These federal cases clearly demonstrate that the owner-tenant concept of employment has no bearing upon the definition of ''agricultural labor'' contained in subdivision (a) of the federal regulation. The point is again made in *Chester C. Fosgate Co.* v. *United States*, 125 F.2d 775, where the court concluded at page 778 ''that the services which Fosgate Company rendered in cultivating crops of fruit for others were rendered on a farm in connection with the cultivation of the soil, and were under Art. 206 (a) agricultural labor, although the owner of the crops did not directly hire the laborers, but dealt with the Company, which in turn put the laborers to work. The labor was done in cultivating the soil, the literal etymological meaning of agriculture.'' It is true that the court, in speaking of businesses which have arisen in recent years that are more nearly mercantile and manufacturing than agricultural, continued at page 778: ''Such businesses have increasingly tended to buy crops in the field or on the trees, thus cutting short the agricultural operations and transferring the harvest to the new business field.'' But in the orthodox sense agricultural operations, the act of producing agricultural commodities, cannot be cut short prior to harvest, and such last-quoted statement confuses the kind of service with the status of the employer, a consideration of no importance with respect to essentially agricultural activities.

This distinction is emphasized in the following federal cases where the meaning of ''agricultural labor'' was considered in relation to other statutes involving a similar employment exemption. Thus in *Ellis* v. *Continental Cas. Co.*, 115 F.2d 1006, in holding that the picking of oranges was ''agricultural labor'' within the meaning of the Workmen's Compensation

Act, the court said at page 1007: "Gathering fruit by hand is manual labor. The operation of an orchard is an agricultural pursuit. The performance of manual labor in an orchard upon the produce of the soil is farm work." And in *North Whittier Heights Citrus Assn.* v. *National Labor Relations Board,* 109 F.2d 76, a case presenting the question of whether employees working in a packing house and engaged in the processing, packing and shipping of citrus fruits were "agricultural laborers" under the "Wagner Act," it is said at page 80: "Industrial activity commonly means the treatment or processing of raw products in factories. When the product of the soil leaves the farmer, as such, and enters a factory for processing and marketing it has entered upon the status of 'industry'." The court then quoted at page 81 from *Pinnacle Packing Co.* v. *State Unemployment Commission,* an unreported Oregon case, as follows: " 'The fruit growers who are engaged in the care, cultivation, picking, and delivery of the products of the orchard to be processed, graded, packed and marketed are engaged in agricultural labor and are exempt from the provisions of the statute. As soon as the fruit is delivered by the growers to the plaintiff for processing, grading, packing, and marketing, then the exemption ceases'." These last two quotations were cited with approval in the recent case of *California Employment Com.* v. *Butte County Rice Growers Assn.,* 25 Cal.2d 624, 633-634 [154 P.2d 892].

Since our rule 7.1 was patently based on the federal regulation, the latter's interpretation has considerable force here in establishing that the owner-tenant employment limitation of the second paragraph of our subdivision (2) should be construed as applicable only to the situations described in the first paragraph of that subdivision immediately preceding the limitation, and not to the definition of "agricultural labor" contained in our subdivision (1), which is the analogue of subdivision (a) of the federal regulation. (*H. Duys & Co.* v. *Tone,* 125 Conn. 300 [5 A.2d 23, 26]; *Woods Bros. Const. Co.* v. *Iowa Unemployment Compensation Com.,* 229 Iowa 1171 [296 N.W. 345, 348-349]; *Unemployment Compensation Com.* v. *Wachovia Bank & Trust Co.,* 215 N.C. 491 [2 S.E.2d 592, 597]; *Industrial Commission* v. *Woodlawn Cemetery Assn.,* 232 Wis. 527 [287 N.W. 750, 753].) In most of the other states where the federal statutory exemption has been "paralleled" by state legislation and the designated administrative agency

has defined the term "agricultural labor," the form of such definition has followed exactly the paragraphing of the federal regulation as a basis for a like interpretation. (*Park Floral Co.* v. *Industrial Commission*, 104 Colo. 350 [91 P.2d 492]; *H. Duys & Co.* v. *Tone*, 125 Conn. 300 [5 A.2d 23]; *Christgau* v. *Woodlawn Cemetery Assn.*, *Winona*, 208 Minn. 263 [293 N.W. 619].) So far as research reveals, the only state which has an administrative regulation which conforms precisely in language and *arrangement* to our own rule 7.1 in defining the statutory exception in its Unemployment Compensation Law is Arizona. (*Wayland* v. *Kleck*, 57 Ariz. 135 [112 P.2d 207].) And in that instance, too, the same reasoning was applied in the interpretation of the state regulation. Thus, it is said in the cited case at page 208 [112 P.2d]: "Our regulations, subdivisions (1) and (2), correspond, in the subject treated, to subdivisions (a) and (b) in the federal regulation and the regulations of other states. *The first subdivision* refers to one kind of labor, which is *always agricultural,* and the *second subdivision* refers to another kind of labor, which *may* or *may not be so classed.* In this subdivision the labor is used in processing things grown on a farm, also the packing, packaging, transportation or marketing the things grown or articles made therefrom. These services, *if done for the owner or tenant of the farm* on which the materials in their raw or natural state are produced and as an incident to the farming operation, as distinguished from manufacturing or commercial operations, are agricultural." (Italics ours.)

This same Arizona rule was involved in the later case of *Employment Security Commission* v. *Arizona Citrus Growers,* 61 Ariz. 96 [144 P.2d 682], wherein the court upheld the right of certain claimants to receive unemployment benefits. There were twelve claimants, eleven of whom worked in the association's packing house and one of whom was engaged in picking fruit from trees belonging to members of the association. The court at page 686 [144 P.2d] expressly approved the construction of the administrative rule defining "agricultural labor" as stated in *Wayland* v. *Kleck, supra.* But then, apparently losing sight of the labor of the *single* claimant engaged in the work of picking fruit, the court at page 686 [144 P.2d] placed *all* claimants under subdivision (2) of the rule as engaged in the packing and processing of fruit. Thus, limiting its language to a discussion of such services

and premising its opinion in the main on the rationale of *North Whittier Heights Citrus Assn.* v. *National Labor Relations Board, supra,* 109 F.2d 76, the court expressed its full conclusion as follows at page 687 [144 P.2d] : "We conclude that the claimants who worked in the Association's packing house are not agricultural laborers, . . ." Consistent with such analysis, it reasonably follows that the narrowed point of decision in the later Arizona case does not affect its approval in the forepart of the opinion as to the propriety of the early interpretation of the Arizona rule as stated in *Wayland* v. *Kleck, supra,* so as to be in harmony with "all other regulatory bodies, both federal and state, that adopted this type of regulation."

Apparently out of line with such uniform construction is certain language in the recent opinion of *California Employment Commission* v. *Rose,* 67 Cal.App.2d 864 [155 P.2d 702] (hearing not requested before this court), purporting to follow the case of *California Employment Com.* v. *Butte County Rice Growers Assn., supra,* 25 Cal.2d 624, in stating at page 868 that "the services performed, regardless of their nature, . . . do not constitute 'agricultural labor' . . . unless the workmen are employees of the owner or tenant of the farm. . . ." While, as aforestated, the Butte County Rice Growers case is concerned wholly with a warehouse enterprise and services in connection therewith falling wholly within subdivision (2) of rule 7.1, it is plain from the import of the quotation from the Butte County Rice Growers case, hereinbefore set forth, that "on the farm" services in "the cultivation of the soil, the raising and harvesting of crops," as stated in subdivision (1) of the rule, always constitute "agricultural labor" irrespective of the status of the employer, and that the latter factor incident to the owner-tenant limitation enters only into the classification of the services specified in subdivision (2). Accordingly, to the extent that language of the Rose case may carry implications contrary to the import of the Butte County Rice Growers opinion, or of the opinion herein, it is hereby disapproved. However, the actual decision in the Rose case is entirely in line with the views herein expressed. There the employer was engaged in the business of baling hay on contract for various farmers. Sometimes the hay was baled on the farms where it was produced, but usually it was hauled to a central location nearby to save the

cost and inconvenience of moving the hay-baling equipment. As so conducted, such independent enterprise was distinct from the farmers' "cultivation of the soil, the raising and harvesting of crops," and the hay-baling labor would properly come within subdivision (2) of our rule as services "in connection with the drying, processing, packing, packaging, . . . of materials which are produced on the farm." Labor so identified would not be agricultural unless "performed by an employee of the owner or tenant of the farm on which the materials . . . were produced."

■ From these observations it is clear that hay baling is an admirable example of "the nature of the work, modified by the custom of doing it," affecting the category into which the work falls—agricultural or industrial. (See *H. Duys & Co.* v. *Tone*, 125 Conn. 300 [5 A.2d 23, 28].) But no change in the custom or method of doing work in the actual production of agricultural crops can make such labor anything other than agricultural, even though the work be done by employees of a person or corporation whose business is industrial or commercial rather than agricultural in nature. ■ So it is in the present case with regard to the field services in "girdling, thinning and harvesting" the crops—the girdling process requires the cutting of the grapevine bark so that the fruit will become larger and sweeter; thinning relates to the removal of leaves from around the grape bunches in order that the grapes may be properly colored by the sun; and harvesting concerns the picking of the fruit. While men are engaged in such "on the farm" work, their activities are essentially agricultural and cannot be otherwise regarded.

It therefore follows from reason and authority that the second paragraph of subdivision (2) of rule 7.1 does not relate or apply to subdivision (1) of that rule, and that all services here in question in connection with raising and producing these crops, up to and including the harvesting thereof, constituted "agricultural labor" within the meaning of our Unemployment Insurance Act.

■ A different situation is presented with respect to that part of the services in question which was embraced within the classifications "office help" and "packing house labor," as made by respondent. Those services were performed off the farm following the harvest, either in the packing house or in the office, and as an integral part of respondent's general business. Such services come within subdivision (2) of rule

7.1 and constitute "agricultural labor" only if done "by an employee of the owner or tenant of the farm on which the materials in their raw or natural state were produced" and "as an incident to ordinary farming operations as distinguished from manufacturing or commercial operations." It therefore becomes important, as to this branch of the case, to determine whether or not the contracts under which respondent purchased this fruit made him a tenant with respect to the various properties.

 The agreements were in substantially the same language in each instance, providing that "the seller [the farmer] has sold" and "the buyer [respondent] has bought" a certain designated crop for a particular season at a stated price payable in installments, the last installment being due about harvest time. The usual arrangements specified that "buyer" would do "all girdling, thinning and harvesting at his own expense," and "seller" would "cultivate, irrigate and do general farming in a farm like manner at his own expense"; though in one or two cases the "buyer" agreed to do some of contracts for the sale of specific crops rather than demises of the "cultivating" and "irrigating." Considering the transactions as a whole, the general terminology would indicate land. The determinative points are stated in 15 California Jurisprudence 610 as follows: "In distinguishing between a lease and a cropping agreement, transfer of possession, special reservation of a right of re-entry for limited purposes only, covenants by the tenant to repair at his own expense, the creation of a definite term especially for several years, and an arrangement to deliver the owner's share of the crops to him off the premises, are all indicative of a lease. On the other hand, retention of possession by the owner indicates a cropping agreement." (*Harrelson* v. *Miller & Lux, Inc.*, 182 Cal. 408, 410 [188 P. 800].) Here there was no transfer of possession and consequently, there was no need for a "special reservation of a right of re-entry" for any purpose. There is no evidence in the record that respondent agreed to make any repairs on the premises or, in fact, did so; the arrangements only related to a period of time required for the maturity of the designated crops; and in no case was the owner to receive any share of the crop, but only a stated sum representing the purchase price. In line with these considerations respondent was never given the right to plant any crop that he desired,

but was limited to the grape or plum crop then being grown on the particular property.

Growing crops, as well as other personal property, are subject to contract for and absolute sale. (*Blackwood* v. *Cutting Packing Co.*, 76 Cal. 212, 215 [18 P. 248, 9 Am.St.Rep. 199] ; *Vulicevich* v. *Skinner*, 77 Cal. 239, 240 [19 P. 424]; *Jones* v. *California Growers & Shippers*, 182 Cal. 777, 778 [190 P. 172] ; *Tillis* v. *Western Fruit Growers, Inc.*, 44 Cal. App.2d 826, 830 [113 P.2d 267].) Not only the language of the contracts but all the surrounding features likewise establish the respective transactions as agreements of sale. Thus, it further appears from the record that it was customary for commercial packers in the area where respondent operated, to buy crops prior to maturity—"The man who ships the fruit usually produces it to his own liking"— and thus be assured some certainty in sales. So the situation concerns not a farmer reaching for a market and preparing his fruit therefor, but a shipper—a man in the marketing business—reaching for a product to sell. He has contacted a market requiring a particular kind of product and to satisfy such demand, he undertakes, through a purchase agreement with the owner of the land where the crop is growing, to control its development to the extent of performing certain "field labor" in connection therewith so as to add "buyer appeal." Such arrangements do not envisage the transfer of any leasehold interest in land but simply the right to control and hasten the maturity of growing crops incident to the purchase of such crops.

As so analyzed, it is manifest that the "packing house labor" and "office help"—services in connection with the handling of crops off the farm and following the harvest, which may or may not be classed as "agricultural labor," depending upon satisfaction of the limitations specified in subdivision (2) of rule 7.1—were performed for respondent not as the tenant of land so as to tie those activities to the farm, but as an independent entrepreneur operating a fruit shipping business. Under the principles governing the decision in the cases of *North Whittier Heights Citrus Assn.* v. *National Labor Relations Board, supra,* 109 F.2d 76, and *California Employment Com.* v. *Butte County Rice Growers Assn., supra,* 25 Cal.2d 624, it follows that those services were not "agricultural labor" within the meaning of our Unemployment Insurance Act.

The judgment is reversed with directions to the trial court to take such evidence as may be necessary in order to determine the amount of contributions assessed with respect to that part of the services in question classified as "packing house labor" and "office help," and to enter judgment for appellant accordingly.

Gibson, C. J., Shenk, J., and Traynor, J., concurred.

Edmonds, J.—I concur in the judgment.

CARTER, J.—I concur in that portion of the majority opinion holding that labor performed in the "girdling, thinning and harvesting" are not subject to the Unemployment Insurance Act (Stats. 1935, p. 1226, as amended; Deering's Gen. Laws, 1937, Act 8780d). But I do not agree with that portion of said opinion holding the packing house labor activity of defendant to be not agricultural and therefore subject to the act.

Defendant is engaged in contracting with producers in which he agrees to purchase their products, and perform certain agricultural duties with regard to producing, harvesting and packing the produce. The majority opinion proceeds upon the theory that, under subdivision a of rule 7 adopted by the commission, packing activities are excluded from the definition of agricultural labor because traditionally, such activities are not concerned with tilling the soil or other of the farm activities, and that under subdivision b, such activities are not agricultural labor, because the employees are not employed by the owner or tenant of a farm. There is no realistic basis for the use of the owner-tenant employer test as the yardstick for measuring the scope of the definition of agricultural labor. It is conceded that if the packing was done by the farmer on the farm it would be such labor. And there can be no doubt about it. The packing of the produce is just as much an essential step in the farmer's business as any other factor. His aim is to make a living, first by growing the produce and then preparing it for sale. That preparation inescapably includes packing. Hence it follows that packing of agricultural products is a farming pursuit. Indeed it must be so characterized in order to fall within the definition of agricultural labor where the employer is an owner or tenant. How then may it be said that the criterion is the status of the em-

ployer—that he must be an owner or tenant of a farm? On the one hand it would not be said that a person was employing agricultural labor if his employees were manufacturing locomotives, *even though he was the owner or tenant of a farm*, and the enterprise was conducted on the farm. On the other hand, if the services performed are the tilling of the soil it is agricultural labor *regardless of whether the employer is an owner or tenant of a farm.* That proposition is conceded by the majority opinion. I can see no other possible conclusion than that the requirement of a tenant-owner employer relationship is not a valid test for solving the problem. The basic principle must be that the vital turning point is the *nature of the services performed.* Are they agricultural in character as that term is used and understood throughout the nation?

In the instant case, packing as we have seen, by its very nature, is a part of the farmer's business, otherwise we leave him with his enterprise half completed. He has produced his crops but ceases to have farmer services performed when he carries his project to its logical conclusion—to the end that he had in view when he launched it,—that is, the packing and disposal of the fruits of his toil. Moreover, there are additional factors in the instant case. Defendant probably is not a tenant of a farm nor are he and the owner of the farm strictly speaking joint adventurers. Yet they have some of the aspects of the latter legal conception. The enterprise as a whole consists of *producing and disposing of farm products.* The owner of the land carries it to a certain stage and defendant completes the process. That process is continuous and unbroken from the seed to the consumer. Merely because the land owner does not perform the final acts, does not make the various phases any the less a part of the course of the activity. In a sense the defendant is performing some of the attendant tasks for the land owner and the latter carries some of the burdens of the former, all to the achievement of a single goal and all an integral and inseparable part of the venture.

The proposition that the scope of the words "agricultural labor" does not turn on the test of an owner-tenant employer relationship is brought out in *Stuart* v. *Kleck*, 129 F.2d 400, 402: "Accordingly, the exemption attaches to the 'services performed', which refers to the *type of work that is being done, and is not dependent on the form of the contract or whether the employee is employed by the owner or tenant of*

*the farm or an independent contractor. . . . The important question, then, is: What is the nature of the services furnished and were these performed upon a farm?"* [Emphasis added.]

A case closely in point is *Batt* v. *Unemployment Compensation Division,* 63 Idaho 572 [123 P.2d 1004, 1005], where it is said: "The only controversy before us is as to whether the appellant, Batt, is liable for contributions under the Unemployment Compensation Laws, . . . upon wages for (a) labor of individuals performed upon farm products purchased by him from *farmers;* and, (b) for the same kind of labor performed on farm products handled on so-called 'consignment'.

"The opinion of the Chief Justice seems to recognize a difference between the work done on (a) purchased farm products and (b) consigned farm products. I am unable to distinguish any material or legal difference between the two.

"The stipulation of facts covering this phase of the question is as follows:

" 'That aside from the produce raised by the applicant the balance for such produce which are processed as hereinafter set forth are secured in the following ways:

" 'The *applicant purchases from the farmer grower the portion of his crop* which is marketable when sorted and graded. To enable applicant to determine the part purchased and to prepare the same for market the farmer delivers such produce at the applicant's shed or warehouse, contained in half bags as taken by the farmer directly from the field as harvested.

" 'The applicant also handles a comparatively small part of potatoes on consignment, in which case the farmer delivers the potatoes from the field as harvested, and after the applicant has processed the same as hereinafter stated and sold the same there is deducted from the sale price the expenss, including a charge for processing and a brokerage charge, and the balance is paid to the farmer. . . .'

"It appears, from the stipulation of facts, and is admitted, that this so-called processing merely consists of sorting, washing and grading these several farm products and packing or crating them for shipment and market. It is further stipulated and found as a fact, that the same laborers do the work on both the purchased and the consigned products; and that the work is identical on both.

"*It is clear that the appellant does, for hire, just such work*

*as the farmer would have to do himself or hire someone else
to do, on the farm or elsewhere, in preparation of his products
for market.* For this labor, the appellant received and
deducted from the sale price 'the expenses including a charge
for processing and a brokerage charge', and paid the balance
to the farmer. . . .

"I fail to see wherein the work done upon consigned products
is any less 'agricultural labor' than that done upon the
same kind of products purchased by appellant, or grown by
him on his own farm. It was all agricultural labor." [Emphasis
added.]

In *Cache Valley T. Growers Assn.* v. *Industrial Com.*, 106
Utah 1 [144 P.2d 537], the employer was not a farmer but
bought turkeys from farmers and processed them for market.
The labor was held to be agricultural. (See, also, *In re Batt,*
—— Idaho —— [157 P.2d 547].)

The decision of the majority in this case is out of harmony
with the principles stated in the companion case of *The Irvine
Company* v. *California Employment Commission, post,* p.
570 [165 P.2d 908], this day decided. First, it is there
stated in regard to the scope of the words here involved:
" 'agricultural labor'—a term 'intended . . . to have a meaning
*wide enough and broad enough to cover and embrace agricultural
labor of any and every kind,* . . . that in modern usage
this is a *wide and comprehensive* term and that statutes using
it *without qualification,* must be given an equally comprehensive
meaning.' " [Emphasis added.] If we give that broad
meaning to the term, the services here performed undoubtedly
bear the characteristics of agricultural pursuits. Second, in
the Irvine case the point is stressed that the courts should not
"pick out some particular phase of the operation as determinative
of whether it was agricultural, industrial or commercial."
They should view the enterprise as a whole. So
analyzed in the instant case, it is apparent that the labor
supplied by the defendant under his contracts with the landowners
was a part of the larger enterprise in which both
participated in producing crops and conditioning them for
sale to the consumers. Third, the Irvine case points to the 1939
amendment to the federal Social Security Act (26 U.S.C.A.
§ 1607) as of persuasive significance in determining the scope
of agricultural labor and the necessity for harmony between
the state and federal acts. Applying that principle to the instant
case we search in vain for any requirement in the 1939

congressional amendment for any restriction in the operation of the exemption on packing house employees to cases where the employer is a land-owner or tenant. It reads: "The term 'agricultural labor' includes all service performed—

"(1) On a farm, in the employ of any person, in connection with cultivating the soil, or in connection with raising or harvesting any agricultural or horticultural commodity, including the raising, shearing, feeding, caring for, training, and management of livestock, bees, poultry, and fur-bearing animals and wildlife.

"(2) In the employ of the owner or tenant or other operator of a farm, in connection with the operation, management, conservation, improvement, or maintenance of such farm and its tools and equipment, or in salvaging timber or clearing land of brush and other debris left by a hurricane, if the major part of such service is performed on a farm.

"(3) In connection with the production or harvesting of maple sirup or maple sugar or any commodity defined as an agricultural commodity in section 1141j (g) of Title 12, as amended, or in connection with the raising or harvesting of mushrooms, or in connection with the hatching of poultry, or in connection with the ginning of cotton, or in connection with the operation or maintenance of ditches, canals, reservoirs, or waterways used exclusively for supplying and storing water for farming purposes.

"(4) In handling, planting, drying, *packing, packaging,* processing, freezing, grading, storing, or delivering to storage or to market or to a carrier for transportation to market, any agricultural or horticultural commodity; but only if such service is performed as an incident to ordinary farming operations or, in the case of fruits and vegetables, as an incident to the preparation of such fruits or vegetables for market. The provisions of this paragraph shall not be deemed to be applicable with respect to service performed in connection with commercial canning or commercial freezing or in connection with any agricultural or horticultural commodity after its delivery to a terminal market for distribution for consumption." [Emphasis added.]

In my dissenting opinion in *California Employment Com. v. Butte County Rice Growers Assn.,* 25 Cal.2d 624, 640 [154 P.2d 892], I discussed the rationale of the federal and state definitions of agricultural labor and the discussion there is pertinent here.

In my opinion the trial court was correct in holding that none of the services here performed were subject to the Unemployment Insurance Act, and the judgment should therefore be affirmed.

Schauer, J., concurred.

Appellant's petition for a rehearing was denied February 25, 1946. Carter, J., and Schauer, J., voted for a rehearing.